**William T. X. FULWOOD, Petitioner,**

**v.**

**Donald CLEMMER, Director of the Department of Corrections for the District of Columbia,**
**and**
**Sam A. Anderson, Acting Superintendent, District of Columbia Jail, Respondents.**

**Civ. A. No. 3211–61.**

United States District Court
District of Columbia.

July 2, 1962.

E. Barrett Prettyman, Jr., Washington, D. C., appointed by the Court, for petitioner.

James M. Cashman, Asst. Corp. Counsel, Washington, D. C., for respondents.

## MATTHEWS, District Judge.

### The Parties and the Cause of Action

Petitioner, an inmate of the District of Columbia Jail,[1] seeks by this action a writ of mandamus or in the alternative a writ of habeas corpus. He complains of alleged religious discrimination practiced against him by the respondents. He says that his religious beliefs have been interfered with, that he has been denied religious practices and contacts permitted prison inmates of other religions, and that he has been punished solely because of his religious views. The petitioner further asserts that respondents have impeded his efforts to bring his grievances to the attention of the appropriate authorities, and have hampered him in his endeavors to contact counsel.

Since June 26, 1959, petitioner has been serving a sentence of from two to six years for robbery. From August 4, 1959 until June 6, 1960, he was an inmate of Lorton Reformatory, Lorton, Virginia,[2] and since then he has been an inmate of the Jail.

Respondent, Donald Clemmer,[3] is the Director of the Department of Corrections, District of Columbia Government. Operating under the Commissioners of the District of Columbia, he is responsible for the general management of the Jail and of Lorton. The superintendents of these institutions operate under his direction and control. Mr. Clemmer, acting under the Attorney General, has and has had legal custody and control of petitioner at all times pertinent to this proceeding. Respondent, Sam Anderson,[4] is the Acting Superintendent of the Jail and, during the present absence of the Superintendent, is in charge of the Jail under Mr. Clemmer's supervision.

### The Faith of Petitioner

While petitioner was in Korea with the United States Army in 1954 or 1955, he learned of the Islamic religion of the Moslems. He first heard of the Muslim faith while in Jail awaiting trial in early 1959, became a convert to that faith late in the same year, and has so remained. Whether the Muslim faith is an authentic offshoot of the Islamic religion of the Moslems is not shown in the record.[5]

The Muslims believe in Allah as their God. They regard their religion as the religion of Islam which teaches submission to the will of Allah.[6] According to their religion Muslims must pray at least five times per day. They must give charity to support the cause of Islam. They must believe in the scriptures, including the Koran, and in the prophets including the prophet Mohammed. They must believe in the resurrection and the hereafter.

Prison authorities have acknowledged that petitioner seems very devoted to his faith,[7] and that it "is in some way related to increasing his status as a negro * * *"[8] To him the main attraction of the Muslim faith is that it gave him something to associate himself with, something to uplift him from the degradation to which he had fallen.

### The Denial of Muslim Religious Services

In September 1959 a group of Muslims at Lorton requested permission from Mr. Clemmer to hold religious services. He took the matter under advisement and discussed their doctrine and their beliefs with them. The matter was under advisement until approximately January 1960, when Mr. Clemmer decided not to permit them to meet. The Muslims at

1. Hereafter referred to as the Jail.
2. Hereafter referred to as Lorton.
3. Hereafter referred to as Mr. Clemmer.
4. Hereafter referred to as Mr. Anderson.
5. Petitioner's Exhibit 1. See also Transcript, p. 524.
6. Transcript, p. 397.
7. Petitioner's Exhibit 28, p. 3.
8. Ibid., p. 7.

Lorton at that time numbered somewhere between thirty and fifty.

Mr. Clemmer was thereafter requested by the Muslims on several occasions, both in writing and orally, to allow Muslim religious services, and on each occasion he declined. Petitioner was among those who requested permission to hold such services. Mr. Clemmer's refusal to allow such services remains in effect.

The decision of Mr. Clemmer not to allow the Muslims to hold religious services was based primarily upon his belief that the Muslims teach racial hatred, that such teaching is inflammatory and likely to create a disturbance or disorder, and hence would not promote the welfare of the prison population. His belief that the Muslims teach racial hatred is not without support in the record. An expert called by petitioner testified:

"I don't know any other religion that teaches racial hatred as an essential part of the faith of the religion. There are many religions which have practiced racial hatred at various times, but this movement is the only movement that I know of which makes it a tenet of the faith that all white people should be hated." [9]

The Muslims "consider the white man as their natural enemy" according to a handbook which a witness for petitioner regards as "a standard and recognized text of religious denominations in the United States." [10]

The spiritual leader of the Muslims is Elijah Muhammad. He describes himself as the messenger of Allah and such description is accepted by his followers. In his writings he portrays the white race as a race of total evil—a race of devils,[11] murderers,[12] thieves, robbers, scientists at tricks, world snoopers, meddlers,[13] and liars. [14] He declares that to survive, negroes and whites must be separated.[15] He advocates the establishment of a separate Black State. Despite the admixture of political aspirations, economic goals, and racial prejudice in Muslim doctrine, substantial emphasis is placed by the Muslims upon religious faith and observances.

### The Muslim Faith is a Religion

Under freedom of religion in this country a person has an absolute right to embrace the religious belief of his choice. The Constitution does not define "religion" [16] and reference to standard sources of the meaning of words indicates that there is not complete agreement on even a definition of the term.[17] Nor is it the function of the court to consider the merits or fallacies of a religion or to praise or condemn it, however excellent or fanatical or preposterous it may be. Whether one is right about his religion is not a subject of knowledge but only a matter of opinion.

It is sufficient here to say that one concept of religion calls for a belief in the existence of a supreme being controlling the destiny of man. That concept of religion is met by the Muslims in that they believe in Allah, as a supreme being and as the one true god. It follows, therefore, that the Muslim faith is a religion.

### Religious Activities in Prison

Petitioner's claim that he has been discriminated against because of his religion is made in the following prison setting.

9. Testimony of Father Chas. M. Whelan, Transcript, p. 48.

10. Transcript, pp. 39, 40. Petitioner's Exhibit 1. See also Respondents' Exhibit 4.

11. Respondents' Exhibit 7.

12. Respondents' Exhibit 6.

13. Respondents' Exhibit 4.

14. Transcript, p. 516.

15. Respondents' Exhibit 2.

16. 76 C.J.S. Religion p. 728.

17. Minersville School Dist v. Gobitis, 3 Cir., 108 F.2d 683, 685, rev. other grounds, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375; Washington Ethical Society v. District of Columbia, 101 U.S.App.D.C. 371, 249 F.2d 127, 129.

The prison management sponsors and encourages religion as a prison program. But participation is not compulsory. The position of prison management as to policy is non-sectarian and interdenominational and to permit every inmate to participate as he sees fit according to his own beliefs.

The prison populations are overwhelmingly Protestant. In the Lorton prison there are 1725 inmates, 1500 colored and 225 white. Of the 1500 colored inmates, only 50 or less are Muslims.

Religious services are held by a large number of denominations at Lorton and at the Jail and are conducted by volunteer as well as paid religious leaders. For example, services are held by Catholics, Jews, and Protestants, including Lutherans, Unitarians, Christian Scientists and the Salvation Army. Bible classes and Moslem Culture classes have been held; and interdenominational services are conducted regularly.

The number of inmates attending a single religious service has ranged from six hundred to fifteen. There are no restrictions as to the number of inmates who may meet for a religious service.

With public funds the District of Columbia promotes and underwrites the religious services and activities of Catholics, Protestants and Jews at Lorton and at the Jail. For example, several full time Catholic and Protestant chaplains are employed to carry on a wide variety of religious duties, and an honorarium is paid to a rabbi when he conducts Jewish services. The paid Catholic and Protestant chaplains consider it a part of their duty to promote the Christian religion.

The duties of the paid chaplains are not restricted to holding religious services. They also lead Bible study and discussion groups, instruct classes, administer rites and sacraments, arrange the symbolism of worship, counsel with the prison staff, direct programs of clinical pastoral training, hold funeral services, counsel inmates, give spiritual advice, coordinate the religious programs with the other programs of the Department of Corrections, lecture prison personnel on the role of religion in the Department of Corrections, advise as to the methods whereby religious practices can be integrated with other prison services, conduct choirs, and help determine which community groups and individuals offer the most representative and helpful ministry.

A chapel large enough to hold three services simultaneously has been built at Lorton with public funds by the Department of Corrections. In addition, virtually all parts of Lorton have been used for religious services at one time or another including small rooms, the dining hall, and the cell block.

It does not appear from the record that any Muslim Minister has ever held religious services at Lorton or at the Jail or has made application to do so. One of petitioner's witnesses at the trial was Lucius X. Brown, a Muslim Minister of the District of Columbia, and he stated he would be willing to teach in Lorton Reformatory the beliefs of the Muslims. As previously stated, the Muslim inmates themselves requested permission to hold Muslim services, and their request was denied.

■ By allowing some religious groups to hold religious services at Lorton and at the Jail, and by conducting such services at public expense, while denying that right to petitioner and other Muslims, respondents have discriminated and continue to discriminate against petitioner in violation of the Order of the Commissioners of the District of Columbia No. 6514–B, dated Nov. 25, 1953, which requires prison officials to make facilities available without regard to race or religion.[18]

### Religious Medals

The Department of Corrections, with public funds, purchases religious medals for Catholic, Protestant and Jewish inmates of Lorton and the Jail. Such medals are treated as regular prison issue, and inmates are allowed to carry such

18. The text of the pertinent portions of this Order are hereinafter set forth.

religious medals on their persons. There is no appropriation for Muslim medals, none is issued by the prison and none is purchasable anywhere in the prison.

Shortly after petitioner arrived at Lorton in August 1959, and while attending an Islamic Culture Class, he was given by the class instructor a religious medal used by the Moslems and Muslims.[19] Thereafter petitioner openly wore the medal on his person. This medal, about the size of a nickel, was made from part of a toothbrush and the top of a tube of toothpaste. In January 1960 the medal was confiscated over the objection of petitioner. All other Muslim medals were likewise confiscated. The main reason given by Mr. Clemmer for this confiscation is that the medals are symbolic of the Muslim doctrine of hate and tend to create in the prison community race tension and disruptive influences. To Mr. Clemmer's knowledge no group other than the Muslims have had their religious medals confiscated.

▮ Since religious medals are being supplied to other religious groups at public expense, the denial to petitioner of a Muslim medal constituted a discrimination against him because of his religion in violation of the Order of the District Commissioners, No. 6514–B, which requires prison officials to act without regard to race or religion.

*Mail List and Newspaper Subscription*

The prison authorities declined to give petitioner permission to correspond with Elijah Muhammad, the leader of the Muslims, and petitioner seeks to have respondents compelled to permit him to carry on such a correspondence.

Mail lists are established for inmates so that they may maintain legitimate familial, legal, welfare and employment contacts. Usually the mail lists include relatives. If inmates have no relatives or none that can be reached, then the mail lists include friends, and occasionally ministers. A minister is customarily put on the mailing list where the inmate prior to entering prison knew the minister. When it has seemed desirable for the good of an inmate, permission has been given for correspondence with a minister the inmate did not know when he entered prison. There is no rigid rule governing mail lists.[20] Petitioner has relatives and apparently has never met Mr. Muhammad.

Petitioner also seeks to have the prison authorities compelled to permit him to subscribe to a newspaper, the Los Angeles Herald Dispatch. He desires to receive this paper because it carries a column by Elijah Muhammad.

For a while petitioner received the Herald Dispatch at Lorton until several issues of the paper were brought to the attention of Mr. Clemmer. On the basis of the issues he saw, Mr. Clemmer ordered that all copies of the Herald Dispatch be confiscated and that order remains in effect. Information had reached Mr. Clemmer that both white and negro inmates were agitated by Mr. Muhammad's inflammatory articles in the mentioned newspaper.

Inmates at Lorton receive two to three hundred newspapers, both from their home towns and elsewhere. The Daily Worker (reputedly a Communist newspaper) and the Herald Dispatch are the only newspapers Mr. Clemmer has confiscated.

▮ Congress has committed to prison authorities the regulation and discipline of prisoners convicted of offenses against the United States,[21] Ordinarily the regulation of the mail of prisoners is a matter within the administrative discretion of prison officials.[21a] Courts lack general supervisory powers over prisons, and in the absence of a showing of a violation of a legal right or of an abuse of discretion by prison officials a court should not interfere.[21b] Petitioner

---

19. Transcript, p. 406.

20. Transcript pp. 183–186.

21. 18 U.S.C.A. § 4042; Dist. of Col. Code, 24–402 and 24–442.

21a. 72 C.J.S. Prisons § 18c, p. 873.

21b. White v. Clemmer, 111 U.S.App.D.C. 145, 295 F.2d 132.

has not sustained his burden of making such a showing in respect of the refusal of respondents to permit him to correspond with Mr. Muhammad or to receive the Herald Dispatch.

*Petitioner's Contact with His Attorneys*

█ Petitioner complains that prison officials have hindered communications between him and his counsel. A letter he wrote counsel for help as to a parole board hearing reached the Superintendent's office but has not since been seen, and the parole hearing was held and parole denied before counsel became aware of petitioner's desire for assistance. On the evidence the court is unable to say what became of the letter. A Personnel Handbook enclosed in a letter by counsel to petitioner was withheld by prison officials. Mr. Clemmer conceded at trial that it should have been delivered, and the court so finds. Petitioner was clearly entitled to send to and receive from his counsel communications as to his parole and alleged violations of his rights as a prisoner.[21c]

*Petitioner's Efforts to Complain to District Commissioners of Alleged Grievances*

Petitioner attempted on occasions to notify the Commissioners of the District of Columbia of his alleged grievances as hereinafter outlined, and to have them take appropriate action, Mr. Clemmer being under the Commissioners.

The order of the Commissioners of the District of Columbia dated November 25, 1953 and designated as #6514–B provides in pertinent part:

"III. *Nondiscrimination in use of facilities and services.*

(a) *Policy.* Every official and employee under the supervision of the District Commissioners in any department, agency, or instrumentality, or any of its constituent units subject to this order shall act without regard to race, religion, color, ancestry, or national origin in all matters relating to the use and enjoyment of, or assignment or entitlement to, any public facility, accommodation, service, or treatment subject to his control, authority, or supervision unless specifically required by statute to do otherwise."

"(c) *Complaints of violation.* Any person who has been aggrieved because the policy of this section has not been adhered to may, within ten days, file with the Secretary of the Board of Commissioners a written statement of the alleged violation setting forth specifically and in detail the facts of the matter. The Commissioners will thereafter cause an investigation to be made and, in the event that the complaint is justified, will take appropriate action."

Mr. Clemmer refused on some occasions to forward petitioner's complaints to the Commissioners, on the ground that they were repetitious in the points involved.

On other occasions he delayed petitioner's complaints beyond the normal processing time, which usually is from three days to two weeks. For example, one petition alleging various discriminatory treatment because of his religion was left by petitioner with a prison notary public on April 22, 1960.[22] It was then sent to Mr. Clemmer. On May 3, 1960, he forwarded it to Commissioner David B. Karrick with a covering letter asking that the Corporation Counsel render an "interpretation" of what "rights" the Muslims had. Petitioner's complaint was thus delayed one day beyond the limit set by the Commissioners in their Order #6514–B, and petitioner did not receive a reply from them.

On still another occasion, petitioner addressed a petition to the Commissioners charging discriminatory treatment because of his religion. His petition was.

21c. In re Ferguson, 55 Cal.2d 663, 12 Cal. Rptr. 753, 361 P.2d 417, 424 and 425, cert. denied Ferguson v. Heinze, 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61.

22. Petitioner's Exhibit 45.

not introduced at trial, nor was it produced in response to a subpoena asking for all documents upon which Mr. Clemmer relied in taking any of the actions charged to him in the complaint.

One of petitioner's complaints to the Commissioners—apparently the one referred to in the preceding paragraph—was sent by the Superintendent of the Jail to Mr. Clemmer on June 23, 1960 [23] and the next day, June 24, petitioner was placed in a control cell where he remained for fifteen days, the maximum time allowed under prison rules.

A disciplinary report [24] which prison officials issued against petitioner (because of his complaint to the Commissioners) charged him with making *false accusations* against such officials in that he alleged (1) that he was being denied his constitutional rights at the whim of some individual or clique (2) that he was being deprived of mailing privileges, and (3) that he was being held "incognito" at the Jail. The first allegation relates to Mr. Clemmer's refusal to permit the Muslims to hold religious services. The second allegation concerns the refusal of prison officials to permit petitioner to write to Elijah Muhammad. The allegation about petitioner being held in Jail incognito was meant to cover the fact that petitioner had been transferred from Lorton to the Jail without his family being informed of the transfer and after his mother had attempted unsuccessfully to visit him at Lorton and had been told that she could come back there to see him later.

 In directing his letter of June 23, 1960 to the District Commissioners petitioner was seeking redress of his grievances in the manner prescribed by the Commissioners in their order #6514–B. It was petitioner's right to set forth the factual allegations relied upon by him, even though they were derogatory or critical of prison authorities. Hence the punishment of petitioner by placing him in a control cell for what he wrote the Commissioners was a violation of his right to seek redress of alleged grievances and cannot be justified.

### The Recreation Field Incident of May 25, 1960

After the Muslims at Lorton had been refused permission to hold religious services, they met informally with each other for several weeks prior to May 25, 1960 in the stands surrounding the prison's recreation field. Their meetings were peaceful, they behaved, and they did not attract much attention. The rules and regulations of the prison specifically allow inmates to meet on the recreation field, and, while there, to talk in loud voices.

On May 25, 1960 about fifteen Muslims, including petitioner, attempted to congregate in a far corner of the stands by themselves. Other prisoners were in the area including some white inmates. But they were apart from the Muslims. While a ball game was in progress and music was playing over a loudspeaker several Muslims spoke to their group, among them petitioner. He stood, and "preached" for twenty minutes or more in a loud voice which could be heard above the music and over about one-third of the bleachers.

Petitioner testified that on the day in question he spoke of the beliefs and practices of the Muslims and of the writings of their leader, Elijah Muhammad, but he did not relate the substance of what he said. On cross examination he conceded that he made references to the white race as liars, thieves and murderers, that he said the white man can not be trusted, that it was the tough luck of black men that they "fought for the white man in the war", and more of the like.[25] The reports of the incident are of the same general tenor.[26] When petitioner was "preaching", the prison guards on the entire recreation field numbered only five or six while the inmates there numbered six or seven hundred.

23. Petitioner's Exhibit 39.

24. Petitioner's Exhibit 32.

25. Transcript, pp. 541–544.

26. Petitioner's Exhibit 25.

There was no interference with the Muslims. However, what petitioner said on racial matters caused tension and resentment among inmates of both races and was of a character tending to breach the peace.

At the time of the recreation field incident there was in effect at the prison a rule [27] reading in pertinent part:

"It is against the law to engage in a *demonstration, disturbance,* strike, or act of resistance, either alone or in combination with others, *which will tend to breach the peace* or which constitutes disorderly conduct." (Emphasis supplied.)

Mr. Justice Murphy in Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, states for the Supreme Court:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include * * * the insulting or 'fighting' words— those which by their very utterance inflict injury or *tend* to incite an immediate breach of the peace. * * *" (Emphasis supplied.)

Petitioner's racial preaching within the hearing of white and negro inmates was such as to be offensive, insulting, and disturbing to white inmates and to non-Muslim negroes and to engender those feelings which tend to menace order.[28] The court, therefore, finds that petitioner engaged in a demonstration tending to breach the peace, thus violating the quoted prison rule and subjecting himself to punishment for such violation.

*The Punishment Inflicted on Petitioner for the Recreation Field Incident*

The one issue remaining for discussion in this case is whether under the circumstances petitioner has been unreasonably punished by respondents for the May 25, 1960 incident on the Lorton recreation field.

The day following the May 25th incident petitioner was given a hearing and was placed in a control cell on the "punitive" side.

A control cell is a cell in a special building. It is approximately eight feet by twelve feet, with a stone floor and stone walls on three sides. There is no window, so that no natural light enters the cell, and the single artificial light is controlled from outside the cell. There is no bed; a mattress is placed on the floor at ten o'clock at night and taken out at six o'clock in the morning. The toilet has no top and in most cases is not flushable from inside the cell. There is no wash basin. There is no furniture of any kind in the cell. An inmate in a control cell is allowed no reading matter, no exercise, no visitors, no mail unless of an emergency nature, and only occasionally a shave and shower. Regardless of the time of year, an inmate in the control cell is allowed to wear only coveralls and shoes without laces.

An inmate in a control cell is given a restricted diet of 2,000 calories daily. For breakfast he usually receives some dry cereal and water, and for lunch and dinner some potatoes and a vegetable or two with bread and water.

Petitioner remained in the control cell alone and on a restricted diet for thirteen days,[29] until June 6, 1960 when he was transferred by Mr. Clemmer from Lorton to the Jail, primarily because petitioner was considered one of several Muslim leaders, and his transfer would prevent other Muslims from rallying around him.

When he arrived at the Jail, petitioner was immediately placed in a Special

---

27. Petitioner's Exhibit 3, Rule 2. See also Transcript, p. 217.

28. Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267.

29. Regulations forbid placing a man in a control cell for a stay longer than 15 days. Transcript, p. 262.

Treatment Unit (STU) cell, where he remained until June 24, 1960, when he was placed back in a control cell for the maximum period of fifteen days as a result of the complaint he sent the Commissioners on June 23, 1960 as heretofore related.

An STU cell is a special cell in which a number of restrictions are imposed on the inmate. For example, an STU inmate is fed in his cell, so that his food is usually cold, he is not permitted to work except on the range, and he is not allowed movies, television, rehabilitation program, Saturday visits, etc.

When he was released from the control cell at the Jail on July 8, 1960, petitioner was immediately placed back in an STU cell, where he remained until January 9, 1961 some six months' time.

He was then placed in the transient section of the Jail, which involves a number of restrictions, such as no money allowance, no movies or television, no free letter privileges, less exercise, no holiday plays, fewer canteen privileges, no rehabilitation program, no Saturday visits, etc.

Thus for more than two years petitioner has never been allowed to return to the general inmate population of either Lorton or the Jail.

██ Despite the power of prison authorities to make proper rules and regulations for the government of prisoners, and to maintain discipline in the prison population, a prisoner may not be unreasonably punished for the infraction of a rule.[30] A punishment out of proportion to the violation may bring it within the bar against unreasonable punishments.[31]

██ In considering the reasonableness or unreasonableness of the punishment for infraction of a prison rule, it is not inappropriate to look into the background of the prisoner in the institution. In the judgment of his prison classification officer petitioner has an emotional disturbance and psychiatric treatment is indicated. He has a heart murmur and suffers from bronchitis. During his more than three years in prison only three disciplinary reports have been issued against him. One was for a fight with an inmate which is not involved in this case. Of the two others, one relates to the recreation field episode of May 25, 1960, and the other to his complaint to the District Commissioners of June 23, 1960, all as hereinbefore set forth.

██ The court also takes into account on the question of whether petitioner's punishment was unreasonable the following: his solitary confinement; his subsequent solitary confinement for the maximum period for exercising a right to which he was clearly entitled; his detention for six months in a special treatment cell; his exclusion for more than two years from the general prison population; the denial to him of the usual recreational and rehabilitative facilities of prison life; the denial to him of the exercise of his religion while allowing such exercise freely to inmates of other religions; his transfer from Lorton to the Jail because of his faith and for the purpose of suppressing and breaking up the Muslim religion in the prison.

The court concludes that the punishment petitioner received is not reasonably related to his infraction of the mentioned prison rule but is in fact unreasonable.

In the light of all the circumstances the petitioner should be returned to Lorton and to the general prison population, subject, of course, to the prison rules and regulations,[32] and he is not to be discriminated against because of his religion.

---

30. American Jurisprudence, Vol. 41 Prison & Prisoners, Sec. 36–37.

31. Robinson v. California, 82 S.Ct. 1417, Concurring opinion of Mr. Justice Douglas, p. 1421.

32. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356.

This memorandum is to serve as the findings of fact and conclusions of law of the court.

The attorney for petitioner is to submit a proposed order in accordance with the views expressed in this memorandum.