**Gerald LA PLANTE**

v.

**Bradford E. SOUTHWORTH et al.**

**Civ. A. No. 77–0327.**

United States District Court,
D. Rhode Island.

Jan. 28, 1980.

116

Paul V. Curcio, Providence, R. I., for plaintiff.

Paul Foster, R. I. Dept. of Corrections, Cranston, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The plaintiff, a former inmate at the Adult Correctional Institutions (ACI), complains that on February 4, 1977 he was brutalized by defendants Correctional Officers Jones and Walters, and that as a result, he sustained personal injuries requiring medical attention, which was denied to him; he further alleges that he was unjustly charged with assault on a correctional officer and as a result was brought before a Disciplinary Board; that he was found guilty and confined in the Behavioral Control Unit for a disproportionate period of time.

The constitutional deprivations complained of are denial of rights secured under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article 1, Section 5 of the Constitution of the State of Rhode Island. Suit is based on 42 U.S.C. §§ 1981, 1983, 1985, and 1986; jurisdiction is premised on 28 U.S.C. §§ 1343, 2201, and 2202.

On February 2, 1977 at the time the plaintiff was required to return to his cell on the third tier of the cell block for a 9 o'clock p. m. bed check, a correctional officer named Toher was attempting to separate two inmates who were in a fight on one of the tiers. The plaintiff states that in order to reach his cell, he had to pass by the fighting inmates and in doing so he touched or moved Officer Toher's arm; he then proceeded without incident to his own cell; 10–15 minutes later, as he was getting ready for bed, two officers came to his cell and said to him, "You want to be a tough guy—we'll see how tough you are when we get you in the rear hall." Allegedly they handcuffed the plaintiff, took him to the rear hall area where "quite a few officers," none of whom he could identify, pushed, kicked and punched him, and then brought him to the Behavioral Control Unit (BCU) where they "threw" him into a cell. He further testified that the next day he asked defendant officer Erickson to get him a doctor because, "I was feeling dizzy, fainting and the back of my head had quite a bit of pain and my back was hurting me, side of my rib cage had quite a bit of pain, had a cut over my left eye." This request was denied, but on February 4, he was examined by Dr. Thomas, the prison doctor, who testified the plaintiff did not complain of dizziness or of having head pains, there were no cuts, contusions, abrasions or marks on the plaintiff's body, there was some tenderness on the right side of the rib cage; the doctor saw the plaintiff again on the 18th at which time he prescribed drugs for complained-of anxiety and depression. The prescription was renewed on March 11, and again on March 25, 1977 and then changed to a different drug on April 8. This last prescription was also renewed for thirty days on April 28 and May 31, 1977.

On February 7, a Disciplinary Board was convened; the plaintiff, who was present and represented by his classification officer, elected not to testify. Officer Toher did not appear; defendant Correctional Officer Sneider testified as an eyewitness to the incident; he stated that Officer Toher did not assault the plaintiff—to the contrary it was the plaintiff who assaulted Toher by "kneeing him." The plaintiff was found guilty of assault on a correctional officer, sentenced to thirty (30) days in punitive segregation, thirty (30) days loss of good time with a recommendation there be a review by the Classification Board at the end of the thirty (30) days. On March 2 the plaintiff was seen by the Classification Board; it reclassified him to a lower status for ninety (90) additional days. The end result was that the plaintiff was in BCU for 120 days, spending 23 hours of each day in his cell, with one hour a day for exercise or shower.

For the first 30 days, he was not permitted to have visitors. At the end of the first month, visitation rights were returned to him and he was given reading lessons once each week. At the end of the second month, his request for the return of his guitar was granted and he was also allowed to have a radio. When asked if he had access to books, he replied he was not interested in reading.

The plaintiff completed his sentence and has been released from the ACI; he has been seen by his own doctor, a psychiatrist; the doctor testified that he examined the plaintiff on July 25, November 4, 10, 15 and 22, 1978 and on April 3, 1979. He found that the plaintiff primarily suffered from an anxiety neurosis which developed into a phobic neurosis and that this illness is the direct result of the punitive segregation the plaintiff was subjected to and which is at issue in this lawsuit. The doctor further testified that a confinement, as in this case, for 120 days, without psychiatric monitoring is totally unacceptable medically. He concluded by stating that the plaintiff's present condition could have been prevented by an examination within one week of his segregation. He conceded on cross examination that there is nothing in the record which indicates the mental status of the plaintiff on the date he was placed in punitive segregation, i. e., whether or not he was neurotic at that time.

On the other side of the coin we have the story of several correctional officers; the

substance of their testimony is that the plaintiff grabbed Officer Toher who was about to step in between two fighting inmates and kneed Toher a number of times; that when the fracas was over, they went to the plaintiff's cell to take him to the BCU and in order to get there it was necessary to pass through the rear hall area; that they did not beat him or use unnecessary force. Hospital records were introduced which show that later that night Officer Toher sought emergency hospital care; the history in the doctor's reports state Toher complained of being kneed in the chest; this account is at variance with oral testimony that the blows inflicted by the plaintiff were in the groin.

*Assault*

The Court is confronted with the difficult task of determining the truth or falsity of two opposing versions of what transpired in the cell block on February 2, 1977. In a prison setting this responsibility is especially heavy. The life of a prison guard is not an easy one; dealing with recalcitrant inmates presents unquestioned personal danger and nothing can be more demoralizing than being victimized by a judgment founded on false accusations of brutality. On the other hand, the inmate, all too often, has only his word to offer as to his experiences in the sequestered quasi-secret setting of a prison; when a court, which is the inmate's last recourse for relief, disbelieves his true story, it devastates all his hopes for justice and engenders tensions and hostilities; it fosters the belief that the vindication of a wrong can only be achieved through retaliatory measures.

I state the foregoing to emphasize the Court does not treat lightly the accusations made by this plaintiff; all the evidence has been carefully considered, but I must conclude that he has failed to prove his allegations.

I cannot accept as true that all the plaintiff did was merely to "touch" Officer Toher's arm; nor can I believe it was imperative he pass the very spot of the fight at the very moment it was in progress. It is equally difficult to accept that he was "kicked, pushed and punched" by "quite a few officers" and not display something more than a "couple of" scratches on his face and a tender spot on his ribs; and if he suffered dizziness and pains in the head, it is very unlikely he would not have told the prison doctor on February 4. Indeed, the defendant even stated he had a cut over his left eye which simply was not true—neither the doctor nor the investigator from the Public Defender's office saw any such injury. I cannot help but conclude it is an exaggerated story; whereas, I do believe the guards' version that the plaintiff interfered and attempted to obstruct an officer in the performance of his duty by assaulting him.

The plaintiff cites, as a guide for this Court, *Johnson v. Glick,* 481 F.2d 1028 (2nd Cir. 1973). I quite agree with its holding—there is no question that the malicious use of force on an inmate by a correctional officer violates the guarantees of the Eighth Amendment of the United States Constitution. In *Johnson* the court did set forth four factors to be considered in determining the constitutional limits of the use of force. However, in this case I find no unnecessary force was used and so the case is inapposite.

*Due Process*

The substance of the plaintiff's due process complaint seems to be that Officer Toher did not appear and testify at the Disciplinary Board hearing. This position is not well taken; the applicable law was definitively pronounced in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and reiterated in *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1975).

In *Wolff v. McDonnell,* we held that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S., at 566 [94 S.Ct., at 2979, 41 L.Ed.2d, at 956]. We noted that "[o]rdinarily, the right to

present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Ibid.* The right to call witnesses, like other due process rights delineated in *Wolff*, is thus circumscribed by the necessary "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.,* at 556 [94 S.Ct., at 2975, 41 L.Ed.2d, at 950]. Within the reasonable limitations necessary in the prison disciplinary context, we suggested, *but did not require,* that the disciplinary committee "state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Id.* at 566 [94 S.Ct., at 2980, 41 L.Ed.2d, at 956]. We were careful to distinguish between this limited right to call witnesses and other due process rights at disciplinary hearings. We noted expressly that, in comparison to the right to call witnesses, "[c]onfrontation and cross-examination present greater hazards to institutional interests." *Id.,* at 567 [94 S.Ct., at 2980, 41 L.Ed.2d, at 957]. We said:

"If confrontation and cross-examination of those furnishing evidence against the inmate were to be allowed as a matter of course, as in criminal trials, there would be considerable potential for havoc inside the prison walls. Proceedings would inevitably be longer and tend to unmanageability." *Ibid.*

We therefore concluded that "[t]he better course at this time, in a period where prison practices are diverse and somewhat experimental, is to leave these matters to the sound discretion of the officials of state prisons." *Id.,* at 569 [94 S.Ct., at 2981, 41 L.Ed.2d at 958].

*Baxter v. Palmigiano,* at 320–322, 96 S.Ct. at 1559 (emphasis added).

*Eighth Amendment*

The plaintiff presents a two pronged argument—a) punitive segregation for one hundred and twenty days under the conditions that existed at the ACI in 1977 violates the Eighth Amendment and b) the punishment was greatly disproportionate to the offense charged.

On August 10, 1977 this Court held in *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.) that, based on the physical conditions alone, the maximum security section was clearly unfit for human habitation according to any criteria used by public health officers or professional corrections personnel, *id.* at 964, and, as to medical care facilities, it stated, as the plaintiff points out:

"Based on the undisputed testimony of a number of well-qualified witnesses, the Court also concludes that psychiatric and psychological evaluations and treatment are inadequate to meet the needs of the inmate population." At 975. "The ACI employed no clinical psychiatrist or psychologist, and had no arrangements to provide such treatment to any inmates." At 976. "The grossly inadequate system of medical care, including psychiatric care, afforded inmates is part of the intolerable totality of conditions at the ACI which, as the Court has found, violates inmates' Eighth and Fourteenth Amendment rights." At 983. The record supports a finding that the present inadequate state of medical service delivery is, as a system, the product of callous indifference. At 984.

Plaintiff's posttrial memorandum at p. 118.

The plaintiff was a member of the class of prisoners who brought the *Palmigiano* suit and therefore, he contends that decision is binding in this case since it pertains to the same issues. The defendants Southworth, Laurie and Brule were also the named defendants in *Palmigiano.* Although I agree that collateral estoppel may sometimes be used as a "sword," not merely as a shield, to apply estoppel here would clearly be inappropriate.

The plaintiff fails to recognize that the findings in the *Palmigiano* suit were premised on the totality of deficiencies which existed. Another extensive quote puts at rest any thought of considering this controversy only on the basis of the *Palmigiano* conclusions.

Alternatively, and as an additional ground of decision, plaintiffs urge the Court to find that the health care delivery system at the ACI, in its own right and without regard to the totality of conditions, is so inadequate as to violate the Eighth and Fourteenth Amendments to the Constitution.

There is impressive unanimity of judicial opinion as to when inadequate medical care to prisoners reaches the level of a constitutional violation. Inadvertent or negligent errors in diagnosis or treatment are not enough to establish a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864 (2d Cir. 1970); *Newman v. Alabama*, 503 F.2d 1320, 1330 n.14 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974); *Todaro v. Ward*, 431 F.Supp. 1129, 1132 (S.D.N.Y.1977). An individual seeking relief must prove "deliberate indifference to a prisoner's serious illness or injury," *Estelle v. Gamble*, 429 U.S. at 105, 97 S.Ct. at 291. In the case of a class action challenging the entire system of medical care delivery, "deliberate indifference" can be shown either by a series of incidents closely related in time or by evidence that "the medical facilities [are] so *wholly* inadequate for the prison population's needs that suffering would be inevitable." *Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir. 1974); *Todaro v. Ward*, 431 F.Supp. at 1133. Plaintiffs' proof was directed at satisfying this second test, which amounts to a recklessness standard, and requires a showing of conscious disregard by the defendants of a substantial risk that serious injury or illness would be engendered or prolonged by the inadequacies of the medical system.

The Court holds that plaintiffs have proved their case in this regard. While the delivery of medical services is not inadequate in a number of respects, and appears to be somewhat better than that found in the most egregious reported case, *Newman v. Alabama*, 349 F.Supp. 278 (M.D.Ala.1972), *aff'd* 503 F.2d 1320, *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974), the *compendium* of serious health and life-threatening deficiencies established by clear and convincing and unrebutted testimony reveals far more than isolated instances of neglect. Instead, the record supports a finding that the present inadequate state of medical service delivery is, *as a system*, the product of callous indifference.

*Id.* at 983, 984. (emphasis added).

Therefore, the claim at stake here must stand or fall on its own merits.

In support of his first point, "a," *supra*, the plaintiff argues that isolation is a form of punishment subject to scrutiny under the Eighth Amendment.

It is equally plain, however, that the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of "grue" might be tolerable for a few days and intolerably cruel for weeks or months. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

The plaintiff argues that given his psychiatric condition, the deprivation of psychiatric care, together with the prolonged isolation, amounted to cruel and unusual punishment.

█ Facially this is an impressive position, but it fails for lack of substantive proof. To begin with, the plaintiff is not seeking injunctive relief—he asks for damages. A compensatory award in a § 1983 action is appropriate only when the defendant has acted with such an impermissible motivation or with such disregard of the plaintiff's "*clearly established constitutional rights* that his action cannot reasonably be characterized as being in good faith." *Morris v. Travisono*, 528 F.2d 856, 858, n.5 (1st Cir. 1976). *See also Harper v. Cserr*, 544 F.2d 1121 (1st Cir. 1976); *Rodriquez v. Ritchey*, 539 F.2d 394, 400–41 (5th Cir. 1976).

■ The plaintiff in this case assaulted a prison guard in the act of quelling a disturbance. This is a serious offense; in the explosive setting of a prison such an act demands quick and stern disciplinary measures. The guards were perfectly justified in placing the prisoner in BCU; this was permissible conduct justifiably and properly motivated. Now, it might be asked if such segregation was constitutionally impermissible. I find it was not, and in so holding I have in mind the alleged psychiatric condition of the plaintiff. If the officers knew of such condition and knew or should have realized that isolation would have serious deleterious effects, the case might have been different. The fact remains they did not know; nor does the picture change by showing he complained of emotional problems while in the BCU. This condition was not ignored—the records show he was seen by a physician on three occasions and received medication daily from licensed nurses. There is no evidence indicating that the prison doctor or any other prison official should have reasonably known something more was needed. Certainly it cannot be said the prison officials displayed a "deliberate indifference" to the plaintiff's illness.

■ Finally it cannot be said the defendants acted in disregard of the plaintiff's "clearly established constitutional rights," by placing and keeping him in the BCU for 120 days. In other words, was the sentence clearly disproportionate to the offense? I find it was not. I will not debate whether a constitutional right was violated by the isolation at issue here. That is not the question—the issue is whether the constitutional right claimed was so clearly established that the defendants' actions in placing the plaintiff in BCU cannot reasonably be characterized as being in good faith.

True, a prison setting does not license prison officials to degrade "the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958). I recognize that prolonged solitary confinement may constitute inhumane treatment—but in this factual setting we must first recognize that the Supreme Court has never held that solitary confinement is *per se* unconstitutional, and lower courts have applied varying standards as to permissible duration. Professor Sheldon Krantz, in his book *Corrections and Prisoners' Rights* has summarized these as follows at pp. 164, 165.

> One court, in *Sostre v. Rockefeller*, 312 F.Supp. 863 (S.D.N.Y.1970), found solitary confinement so repellent that it held that in order for it to be constitutional it must be limited to fifteen days and can be imposed only for serious offenses. This formula was later reversed, however, in *Sostre v. McGinnis*, [442 F.2d 178 (2nd Cir.)] *supra*. There is an utter lack of uniformity on the issue of duration of solitary confinement in other opinions. *See Knuckles v. Prasse*, 302 F.Supp. 1036 (S.D.Pa.1969) (upholding 400 days segregation for participation in a religiously-motivated disturbance); *Adams v. Carlson*, 368 F.Supp. 1050 (E.D.Ill.1973) (segregation for period of sixteen months for participation in prison work stoppage cruel and unusual punishment); *Aikens v. Lash*, 371 F.Supp. 482 (N.D.Ind.1974) (indefinite segregation is permissible as long as there is periodic review conducted in accordance with minimal due process requirements). While there is no uniformity in these decisions or agreement on an appropriate test to be applied, many courts do attempt to determine whether the duration is reasonably related to the offense committed. *See Fulwood v. Clemmer*, 206 F.Supp. 370 (D.C.Cir.1962) (2-year confinement for participation in illegal religious service invalid because not reasonably related to offense committed).

■ I must conclude that since—within the holdings of prevailing precedent—the confinement was not excessive, medical care was not deficient, there was no obvious deterioration of the plaintiff's health, the place of confinement was not filthy or unfit for human habitation, reasonable privileges were not denied and adequate diet provided, it cannot be said the defendants disregarded the "clearly established constitutional rights of the plaintiff."

Since the plaintiff's second point, "b" *supra* is embodied in what has already been said it need not be discussed separately.[1]

Judgment will be entered for the defendants. An order will be prepared accordingly.[2]

---

1. The plaintiff and defendant have argued the application of *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691, 695, 98 S.Ct. 2018, 56 L.Ed.2d 611 and this Court's interpretation of *Monell* as set forth in *Leite v. City of Providence*, 463 F.Supp. 585 (D.R.I. 1978). The Court, having exonerated the defendants from all liability, finds that the *Monell* case is not relevant and need not be discussed.

2. The Court expresses its sincere appreciation to the plaintiff's attorney Paul V. Curcio and to his firm Hinckley, Allen, Salisbury & Parsons for the services rendered in this case. At the Court's request Mr. Curcio represented Mr. LaPlante without compensation. His preparation, trial performance and briefs exemplified the true professionalism of a fine lawyer. I commend him. I must add that I am not unmindful that the quality of advocacy practiced by Mr. Curcio required considerable time and effort as well as the expenditure of his own funds. I regret I know of no procedure which might afford a measure of reimbursement.