**Harold Lee JONES**

**v.**

**C. C. PEYTON, Superintendent of the Virginia State Penitentiary.**

**Civ. A. No. 5203.**

United States District Court
E. D. Virginia,
Richmond Division.

May 27, 1968.

James E. Kulp, Richmond, Va., for petitioner.

Reno S. Harp, III, Asst. Atty. Gen. of Virginia, Richmond, Va., for respondent.

## MEMORANDUM ORDER

KELLAM, District Judge.

Harold Lee Jones (Jones) filed a petition in this Court on March 30, 1967, for writ of habeas corpus and injunctive relief asking that this Court take jurisdiction under Title 28 § 2241 and Title 42 § 1983, U.S.C. He alleged he is an inmate of Virginia State Penitentiary, having been sentenced (a) July 8, 1952, from the Circuit Court of Warwick County to 20 years for robbery, and (b) July 14, 1952, from the Corporation Court of Newport News to life imprisonment for armed robbery and 10 years for felonious shooting. He further alleges that during the week commencing January 16, 1967, he was tried in the Circuit Court of Richmond upon charge of murder for killing a guard at the Penitentiary, and acquitted.[1]

Following the killing and pending trial, Jones says he was in solitary confinement in "C" Building,[2] and that after his acquittal of the charge he was again placed in "C" Building by order of the Superintendent of the Penitentiary. Among other things, Jones alleges that:—

(1) On February 9, 1967, he wrote C. C. Peyton, Superintendent of the Penitentiary "requiring administrative relief by release to the general prison population" on the ground that extra-punishment by confinement in "C" Building "is not concomitant to prison confinement in the absence of a verified violation of law or lawful prison rule" and * * * "is extra-punishment and * * * constitutes cruel and unusual punishment inflicted in violation" of state and federal constitutions.

(2) That on March 6 and March 14, 1967, C. C. Peyton directed statements to him that "he should be awaiting the electric chair" in spite of his acquittal.

(3) On March 18, 1967, during his absence, custodial officers of "C" Building entered his cell and "took, stole and carried away" duplicate copy

---

1. Petitioner says he entered plea of self defense. If found guilty the jury must impose death penalty. § 53–293 Code of Virginia, 1950, as amended.

2. Petitioner says he was in solitary in "C" Building during time awaiting trial except while in the Criminal Ward of Central State Hospital, Petersburg, Virginia, for mental study and observation.

of letter written by him to Peyton and copies of "other correspondence" written by him to his attorney, Howard H. Carwile.

The above petition was filed by order of March 30, 1967, petitioner granted leave to proceed in forma pauperis, and respondent requested to answer. Respondent answered April 28, 1967, that said Peyton, Superintendent of the Virginia State Penitentiary, directed that Jones be confined to "C" Building and personally escorted him from the East Basement to "C" Building on Monday, January 23, 1967, because Peyton did not feel that the climate of the Penitentiary was conducive to permit Jones to be released into the general population, as Jones had just been acquitted of the charge of murdering a penitentiary guard. Shortly thereafter, upon inquiry, Jones' counsel was advised of the reason for his confinement in "C" Building and thereafter wrote Jones that he agreed to such placement; that Jones did write Peyton on February 9, 1967 (copy of which he sent to his attorney, Carwile) and thereafter Peyton interviewed Jones and advised him that under the circumstances it was best for him to remain in "C" Building. Respondent says the petition does not state a claim for relief.

On May 4, 1967, Jones filed a reply in which he charged that on April 21, 1967, "another theft" from his "cell occurred (cigarettes)"; that when complaint was made, he was "confined in solitary."

On May 25, 1967, a supplement to the petition for writ of habeas corpus and injunction was filed in which he charged that:—

(1) Between May 3 and May 10, 1967, copies of seven letters "pertaining to legal objectives" were stolen from his cell.

(2) On May 15, 1967, he was "confined to a continuously padlocked cell," which the Assistant Superintentent said was not intended as punishment "but for the good of the institution." Petitioner says this is "an additional cruel and unusual punishment," and results because of this pending litigation.

(3) Prisoners in padlock, or not in padlock, and prisoners in "C" Building are afforded less opportunity for unhampered effective access to the courts than prisoners in general population.

On May 25, 1967, petitioner filed a motion for injunction to permit an available third person to act for him or in his behalf in the preparation and filing of applications for habeas corpus, and that they be allowed reasonable periods of consultation with such third party.

On June 29, 1967, a second supplement to petition was filed wherein he alleges that:—

He is denied opportunity to prepare and file petitions for writs of habeas corpus in the courts of Virginia, and that he be ordered released from a padlocked cell.

By order of September 22, 1967, petitioner was granted a plenary hearing on all issues.

Pursuant to notice, the depositions of C. C. Peyton and Harold Lee Jones were taken on November 22, 1967, and filed herein on May 6, 1968, and the matter came on for further hearing and argument at that time.

On January 23, 1967, C. C. Peyton, Superintendent of the Virginia State Penitentiary, placed Jones in "C" Building. On this day Jones had been acquitted of killing a guard at the Penitentiary. Following the killing and pending the trial, Jones had been held in the "East Basement." Peyton's reason for placing Jones in the "C" Building was that he did not feel Jones should be released to the general population of the institution. He discussed this matter with Jones, and told Jones he was not being released to the general population because he "thought it would be best for all concerned to place him in 'C' Building." Peyton felt this was for Jones' good as well as for the good of the institution. He said the killing of a guard

caused repercussions and he was concerned over what might happen if Jones was released to the general population. He could not say when Jones would be released, but he was definite he did not mean he would never be released. Peyton has interviewed Jones several times since he was placed in "C" Building. All prisoners in "C" Building are interviewed routinely (every six months) to determine if they "are ready for release" to the general population of the Penitentiary. Jones was at one time placed "under padlock" because two of the guards overheard Jones talking about a method of how he "could kill someone and kill the witness, which would * * * eliminate any action taken against him if he were to succeed." Upon recommendation of the Assistant Superintendent, Peyton ordered Jones placed "under padlock." Jones denied any such talk. Peyton said he felt he had better take action "before something happened * * *. He has been a dangerous prisoner. He killed a guard. He could do this again." Prisoners in "C" Building are deprived of some privileges which prisoners in the general population enjoy.

In addition to the above, Jones made charges that Peyton had said "he (Jones) should be awaiting the electric chair." This was emphatically denied by Peyton and is not established by the evidence. Jones also made a charge that the custodial office of "C" Building entered his cell and "stole" written matter, and again that "another theft" occurred on April 21, 1967. These complaints were heard and Jones was disciplined for these accusations by being placed in solitary.

Jones further says that he is not afforded the same opportunity of access to the courts as prisoners in general population, and that he is denied the opportunity to prepare and file petitions for writs of habeas corpus. The evidence does not support this contention. It supports the contrary. Between March 29, 1967, and June 29, 1967 (part of which time he alleges he was in solitary), he filed five separate papers in this suit, all of which were prepared by someone other than Jones. Jones' own conduct is responsible for the loss of some of his privileges. In Abernathy v. Cunningham, 4th Circuit, 393 F.2d 775, after quoting this language from Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system" the Court said:

"Certainly the maintenance of prison discipline is a consideration ever present in the minds of prison officials, a consideration which in itself makes necessary the withdrawal or curtailment of numerous rights and privileges a prisoner would otherwise enjoy."

The memorandum opinion in Pruitt v. Cunningham, #11,109, 4th Circuit, filed October 5, 1967, deals with a situation similar to the case at bar. There the Court held Pruitt had not exhausted his state court remedies and no cause of action for the jurisdiction of the federal courts had been stated. In passing on the question of confinement of the prisoner in "C" Building, the opinion says:

"The use of 'C' Building, with its attendant deprivations, does not of itself violate a prisoner's federal rights. Of course, a prisoner could not be so confined for attempting to exercise protected rights, such as those involving freedom of religion or access to the courts. See Howard v. Smyth, supra; Coleman v. Peyton, 4 Cir., 340 F.2d 603. In the present case no such rights are claimed and the pleadings indicate that there is justification for the authorities' decision to remove Pruitt from the general prison population. While it was the jury's will to save Pruitt from the mandatory death penalty, its decision did not preclude his being considered a dangerous prisoner. His past history, including his confessed narcotics addiction, points to the contrary. Because of the nature of penal confinement, prison

officials 'must be allowed to exercise a largely unfettered discretion in deciding what security measures are appropriate and, with respect to each prisoner, what relative freedom he safely may be allowed.' Roberts v. Pegelow, 4 Cir., 313 F.2d 548, 550."

■ There is abundant authority that except in extreme cases the courts will not, and should not, interfere with the conduct of a prison, with the enforcement of its rules and regulations, or its discipline. Such was the holding in Childs v. Pegelow, 321 F.2d 487, 490 (4th Cir. 1963), where the Court said:

"It has been pointed out repeatedly that prisoners suffer a limitation of many privileges and rights, Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), even a limitation of the right to bring civil actions. See Tabor v. Hardwick, 224 F.2d 526 (5th Cir. 1955), and reference therein to the recognition of the fact that, under the laws of many states, imprisonment destroys the legal capacity of penitentiary inmates to sue. We find no basis in the present cases for making an exception to the general rule that courts will not interfere with routine matters of prison administration. We, therefore, hold that no justiciable issue was presented by the petitions and there was no duty devolving upon the District Court to conduct a hearing or consider the merits of the charges."

And in Roberts v. Pegelow, 313 F.2d 548 (4th Cir. 1963), the Court said the question of whether the conduct of a prisoner "reasonably justified the punishment he received * * * is not a matter for judicial consideration. So long as the punishment imposed for an infraction of the rules is not so unreasonable as to be characterized as vindictive, cruel or inhuman, there is no right of judicial review."

■ Here Jones asks that his judgment be substituted for that of the Superintendent—one who has twenty-eight years of experience in such matters. Upon the facts of this case, the Court should not attempt to substitute its judgment for that of the prison authorities. Petitioner is not entitled to any of the relief prayed for and the petition is dismissed. It should also be pointed out that petitioner has not exhausted his state court remedies and, while not entitled to consideration until he does, the petition need not be dismissed at this point on that ground.

Petitioner may appeal in forma pauperis, but a certificate of probable cause is denied.

The Court expresses appreciation to James E. Kulp, Esquire, for his splendid service rendered in this matter.