William E. KNUCKLES, Arthur L. McKee, Isaiah Green and Joseph Tillery, Plaintiffs,

v.

Arthur T. PRASSE, Commissioner of Correction, Joseph R. Brierley, Superintendent, State Correctional Institution, Philadelphia, and Alfred T. Rundle, Superintendent, State Correctional Institution, Graterford, Defendants.

James WASHINGTON, Plaintiff,

v.

J. R. BRIERLEY, Superintendent, State Correctional Institution, Philadelphia, Defendant.

Civ. A. Nos. 41770, 42445.

United States District Court
E. D. Pennsylvania.

July 31, 1969.

Walter L. Foulke, Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiffs.

Frank P. Lawley, Jr., Frank Wright, Richard M. Goldberg, Harrisburg, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

### INTRODUCTION

These two consolidated actions under the Civil Rights Act, 42 U.S.C.A. § 1983, lead us into the difficult area where the exigencies of effective prison administration threaten to collide with those constitutionally protected freedoms assured all persons not in prison. Plaintiffs are five prisoners in the Pennsylvania State Correctional System. Knuckles, McKee, Green and Tillery were inmates at the State Correctional Institution at Graterford, Pennsylvania (hereinafter referred to as "Graterford") during most of the time relevant hereto. Washington was an inmate at the State Correctional Institution at Philadelphia, Pennsylvania (hereinafter referred to as "Philadelphia") during most of the time relevant hereto.

The plaintiffs allege that they were:

(1) Denied the right to practice their religion in violation of the First Amendment and the Fourteenth Amendment; and

(2) Denied the privilege of religious practice available to members of other faiths in violation of the Fourteenth Amendment; and ¶ (3) Harrassed and punished with particular harshness because of their religious beliefs in violation of the First Amendment and the Fourteenth Amendment; and

(4) Subjected to cruel and unusual punishment in violation of the Eighth Amendment.

After careful consideration of plaintiffs' allegations, I appointed Walter L. Foulke, Esquire to represent them. Mr. Foulke represented the plaintiffs with commendable diligence by both a most meticulous preparation and an effective presentation at considerable time, effort and costs. Apparently, the law firm, with which he was then associated, Drinker, Biddle & Reath, absorbed the financial costs in this matter.

A six day hearing produced some 925 pages of testimony and ninety exhibits. Extensive briefs and proposed findings of fact and conclusions of law were submitted, and there was subsequent oral argument.

Prior to oral argument, plaintiffs filed additional actions naming Clarence R. Wolfe and David N. Meyers as defendants. These actions were identical to the above-captioned actions and were filed in the apparent belief that the testimony taken in the hearing revealed the direct responsibility of these two men for the alleged wrongdoings. Wolfe and Meyers were present during the entire hearing and were satisfied that their interests were fully represented by counsel for the Commonwealth. They therefore agreed to be joined as defendants in these actions and to be considered as though they had been defendants from the outset. Plaintiffs, in return, agreed to dismiss the additional actions against Wolfe and Meyers. Some time after the hearing and oral argument, Mr. Foulke joined the staff of the Philadelphia District Attorney, and I reassigned plaintiffs' cases to Morris R. Brooke, Esquire, who had been associated with Mr. Foulke in their preparation.

■ Two sets of facts and their legal consequences call for attention here. There are questions about plaintiffs' constitutional rights and privileges to practice the Muslim religion while in prison. There are also questions about the treatment directed against four of the plaintiffs after they took part in the Graterford incident of May 23, 1966. For reasons to be elaborated below, I find that while certain of the restrictions placed on plaintiffs' practice of the Muslim religion were constitutionally valid, other restrictions were constitutionally invalid. Accordingly, plaintiffs must be given somewhat expanded rights to practice the Muslim religion. At the same time, it must be clearly understood that prison authorities continue to have the right to subject the practices of the followers of the Muslim religion or the followers of any other religion to. "reasonable regulations, necessary for the protection and welfare of the community involved." Long v. Parker, 390 F.2d 816 at 820 (3rd Cir., 1968).

I further find that after the Graterford incident, plaintiffs were subjected to cruel and unusual punishment from the morning of May 23, 1966, until the afternoon of May 25, 1966 in violation of the Eighth Amendment, but since it does not appear that this unfortunate two and one-half day practice has been or will be continued, injunctive relief is DENIED.

A final decree is held in abeyance for thirty (30) days so that counsel may explore, and hopefully stipulate to, specific methods for affording relief to plaintiffs consistent with this opinion.

## II.

### FINDINGS OF FACT

1. Plaintiffs in Civil Action No. 41,170, are William E. Knuckles (C4410), Arthur L. McKee (H3683), Isaiah James Green (E9329), and Joseph Tillery (H5318).

2. Plaintiff in Civil Action No. 42,-445, is James Washington.

3. Defendant, Arthur T. Prasse, at all times relevant hereto was Commissioner of the Bureau of Corrections of the Commonwealth of Pennsylvania. He is qualified as an expert in prison administration, penology and corrections.

4. Defendant, David N. Meyers, from before May 1966 until 12:00 A. M., May 25, 1966, was Superintendent at Graterford. He is qualified as an expert in prison administration, penology, and corrections.

5. Defendant, Clarence R. Wolfe, was Deputy Superintendent at Graterford, and in that position he was directly responsible for disciplinary proceedings and the administration of the maximum security cell block. He is qualified as an expert in prison administration, penology, and corrections.

6. Defendant, Joseph R. Brierly, at all times relevant hereto was Deputy Superintendent, and thereafter until now was, and is, Superintendent at Philadelphia. He is qualified as an expert in prison administration, penology, and corrections.

7. Defendant, Alfred T. Rundle, from 1961 through May 25, 1966, was Superintendent at Philadelphia, and thereafter was, and is, the Superintendent at Graterford. He is qualified as an expert in prison administration, penology, and corrections.

8. From before May, 1966, to the present, all of the plaintiffs have been and are followers of the teachings of the Honorable Elijah Muhammad.

9. The followers of the Honorable Elijah Muhammad, often called Muslims or Black Muslims, are a sect of the Islamic Religion, and for purposes of the issues before the court are recognized as members of a bona fide religion. In their brief, defendants stated:

"For the purposes of these actions, it is admitted that Black Muslimism is a 'religion' as that term is used in the United States Constitution."

(P. 3, Brief for Defendants.)

10. At all times relevant hereto, the defendant prison officials in the prisons

under their control and direction did *not* permit the Muslims to

(a) congregate for prayer meetings or services;

(b) have the assistance and counselling of a Muslim minister;

(c) subscribe to Muslim periodicals;

(d) receive certain Muslim books;

(e) correspond with Muslim ministers or with the Honorable Elijah Muhammad;

(f) receive and wear Muslim medals; or

(g) have special dietary programs consistent with their religious beliefs.

11. The policy outlined in paragraph 10 is followed primarily because defendants believe that the presence and activities of Muslims in prison creates a dangerous situation.

12. The Muslim religion forbids adherents from eating pork, pork products, or food which has been cooked in or mixed with pork or pork products.

13. The Holy Qur'an is the central book of the Muslim religion and contains its basic teachings and principles.

14. Followers of the Honorable Elijah Muhammad prefer the edition of the Holy Qur'an which contains both the Arabic and English language versions of the text.

15. Prior to October 18, 1967, members of the general prison population were permitted to obtain a copy of the Holy Koran from the Islamic Center in Washington, D. C. This edition contains only the English version of the text.

16. By letter of October 18, 1967, the Attorney General of Pennsylvania advised defendant, Arthur T. Prasse, Commissioner of the Pennsylvania Bureau of Corrections, *inter alia,* that:

"(b) Any inmate may purchase a Koran or Qur'an or Quran directly from any recognized publisher, provided the edition * * * has first been submitted to the Bureau * * * for examination and approval. Approval shall be given unless the particular edition * * * is detrimental to the administration, safety or security of a correctional institution. * * * "

17. The books, Message to the Blackman In America, and The Supreme Wisdom, contain the basic teachings of the Honorable Elijah Muhammad, including his interpretations of the basic tenets of the Muslim religion and their application to present day facts and circumstances.

18. The periodical, Muhammad Speaks, contains, *inter alia,* articles about the accomplishments of non-whites.

19. Throughout Message to the Blackman In America, The Supreme Wisdom, and issues of Muhammad Speaks, there are references to members of the Caucasian race as "devils", enslavers of Negroes, and the national enemy of Negroes and other non-white races.

20. Every issue of Muhammad Speaks contains a statement of the Muslim Program and Beliefs as reprinted in part in footnote 10 below, pages 1050 and 1051.

21. The Muslim teachings of the Honorable Elijah Muhammad found in Message to the Blackman In America, The Supreme Wisdom, and issues of Muhammad Speaks, are readily susceptible to a broad range of contradictory and varied interpretations:

(a) From one perspective a rational person could interpret the writings and teachings of the Honorable Elijah Muhammad as an endorsement of a concept of intense hatred for all whites, who are referred to as "devils". Further, these writings and teachings could be interpreted as an endorsement of a concept that whites generally and prison authorities should be defied by Muslim prisoners even when legal orders or demands are made.

(b) From another perspective, a rational person could interpret the writings and teachings of the Honorable Elijah Muhammad as merely a partisan historical analysis of this nation's shameful history of slavery and a condemnation of racial discrimination, past and present, in the United States and other Anglo-Saxon nations.

The latter view sees Black Muslim teachings as merely harsh protests against past racial injustice, urging that such injustices be eradicated by non-violent means. One of the ways to eradicate injustices, according to the followers of the Honorable Elijah Muhammad, is to recognize the futility of ever getting whites to accept the black man on the basis of full equality. Therefore, Black Muslims must learn the necessity of supporting black separatism.

22. Either of the inferences as suggested in Finding 21(a) or Finding 21(b) would be permissible and undoubtedly many persons within the prison population, and many outside of the prison population, would adopt inference (a) and many would adopt inference (b) as fair interpretations of those teachings.

23. It is not unreasonable or irrational for some prison administrators to believe that the Muslim teachings of the Honorable Elijah Muhammad found in the Message to the Blackman In America, The Supreme Wisdom, and issues of Muhammad Speaks are readily susceptible to an interpretation that might encourage aggressive hostility toward white prisoners and prison officials as well as toward Negroes who refuse to become Muslims. This interpretation might encourage Muslim prisoners to assist fellow Muslims who are being disciplined for infractions of prison rules.

24. Minister Jeremiah Shabazz, who testified at the trial, is an experienced Muslim minister, qualified to explain the teachings of the Muslim religion set out in the publications discussed above and the duties incumbent upon a Muslim adherent.

25. According to Minister Jeremiah Shabazz, Muslims are required by their religion to refrain from acts of aggression against others, to refrain from the consumption of alcohol or the use of drugs, and to be obedient to those in lawful authority. Muslims are urged to be industrious, just, truthful, and prayerful and to obey the dietary rules.

26. Minister Jeremiah Shabazz has visited various prisons on more than twenty occasions and has spoken to hundreds of Muslim prisoners and ex-prisoners. He has also conducted Muslim services in prison on several occasions. He is not, however, an expert in the operation of a prison.

27. Breaches of prison discipline in Pennsylvania caused by Muslims allegedly carrying out the teachings of their religion—including that at Philadelphia in September, 1959, and that at Graterford in May, 1966—involved Muslims who were not receiving regular teaching or counselling from a Muslim Minister.

28. If permitted, Minister Jeremiah Shabazz would counsel and conduct services for Muslim prisoners at Graterford and at Philadelphia.

29. Religious services are regularly held for prisoners of the Protestant, Catholic and Jewish faiths and are conducted by ministers and rabbis of the respective religions.

30. The Roman Catholic Chaplain at Graterford holds mass every Sunday and on Holy Days, and is permitted to pass freely throughout the prison and to visit the maximum security cell block.

31. A prison guard is always present at the Catholic services.

32. Minister Jeremiah Shabazz would not object to the presence of prison guards at services conducted by him in prison.

33. No evidence has been submitted of a breach of prison discipline by Muslim prisoners following and/or attributable to the preachings in prison of Minister Jeremiah Shabazz or any other Muslim Minister.

34. The presence in a prison of the Muslim publications, Message to the Blackman In America, The Supreme Wisdom, and issues of Muhammad Speaks, create a danger that:

(a) Muslims will interpret the language to require that they act contrary to the demands of orderly prison administration; and

(b) Non-Muslim Negroes will fear that Muslims will act aggressively in trying to recruit them or will ostracize those who will not join; and

(c) White prisoners will fear that Muslims will act aggressively toward them; and

(d) These fears will increase tension in the prison and lead to instability and an increased probability of hostile outbursts, conflict among the prisoners, or other breaches of prison discipline.

35. The members of the Muslim group tend to stick together in prison and to exclude non-Muslims from their group. They also actively and aggressively recruit other Negroes.

36. There are numerous groups and sub-groups in the prison community formed along such lines as age, crime for which sentenced, job within prison. To some degree all of these groups exclude outsiders. The members of all such groups tend to stick together.

37. Some minor disciplinary problems are handled by the offending inmate's prison chaplain. Often the prisoner will correct his behavior without necessitating that prison officials take formal disciplinary measures against him.

38. Pennsylvania prison administrators object to the following Black Muslim activities in prison:

(a) The Muslims stick together and advocate separation of the races;

(b) The Muslims actively and aggressively recruit new members, causing distress and fear among many prospective recruits;

(c) The Muslims advocate unconditional release for all Muslims held in prison;

(d) The Muslims interfere with prison discipline by preventing guards from disciplining other Muslims who have violated prison rules or by demanding that they too be punished if their "brother" is. These activities and beliefs raise the tension level in the prison.

39. Prison officials fear that allowing Muslims to wear even non-dangerous medallions would be detrimental to prison discipline because it would identify the wearers as members of the Muslim group.

40. Some Muslim prisoners were introduced to the Muslim beliefs and became Muslims in prison.

41. There is a prison policy at Graterford, generally enforced by the chaplains, not to permit the prisoners to write to the heads of their religions.

42. There is a prison policy at Graterford not to permit the prisoners to subscribe to out-of-state newspapers. However, prisoners may subscribe to the Christian Science Monitor, which is published outside of Pennsylvania.

43. At all times relevant hereto James Washington was in custody at Philadelphia and thus had no connection with the Graterford incident of May 23, 1966. Knuckles, McKee, Green and Tillery (sometimes called "the plaintiffs"), complain of the treatment they received after that incident.

44. On May 23, 1966, at 10:00 or 10:30 A. M., about 120 inmates of a total prison population of 1500 were in the general recreation yard. About fourteen of the inmates, all followers of the Honorable Elijah Muhammad, were gathered together in the yard. When a non-Muslim inmate tried either to join or pass through the area occupied by the group or ran into one of the group, the Muslims turned on him, struck him and kicked him numerous times. They also struck and kicked another inmate.

45. When guards tried to break up the fight, some of the Muslims, including perhaps one or more of the plaintiffs, physically attacked them.

46. A few minutes after the guards arrived the Muslim group stopped fighting and formed a small circle.

47. The fourteen Muslims were taken into the main corridor of the prison and "strip searched". They were then told to dress, were handcuffed together in pairs and marched to the maximum security cell block (hereinafter referred to as "Maximum security").

48. A "strip search" consists of the following:

(a) The person to be searched is made to disrobe completely;

(b) He is made to expose to inspection the palms of his hands and the soles of his feet;

(c) He is made to open his mouth for inspection;

(d) He is made to bend over from the waist and spread his buttocks for inspection; and

(e) Finally, his hair is examined.

49. In a maximum security prison the "strip search" is necessary to prevent the transportation of contraband.

50. When the Muslims arrived in maximum security, they were stripped, searched, and placed two inmates to a cell, in cells numbered 1 through 5, and one inmate per cell in cell 6 and cell 7 as follows:

Cell No. 1—William Knuckles and Isaiah Green.

Cell No. 2—Edwin Walker and Leon Bard.

Cell No. 3—John Hosendorf and Wendel Green.

Cell No. 4—Alex Howard and Joseph Tillery.

Cell No. 5—Arthur McKee and Willie Haywood.

Cell No. 6—Ronald Foster.

Cell No. 7—Harold Brooks.

51. Prior to the placement of these inmates in maximum security, there were 13 vacant cells, not including those reserved for inmates under sentence of death.

52. After their placement in maximum security there were six vacant cells, not including those reserved for inmates under sentence of death.

53. None of the occupied cells in maximum security contained more than one inmate except cells 1 through 5.

54. At the time the inmates were admitted to maximum security, prison officials feared that further outbreaks might occur that day.

55. The inmates were placed two to a cell to segregate them as much as possible, to seal off their disturbing influence, and to leave a few cells vacant in the event further outbreaks necessitated the rapid segregation of offending prisoners.

56. The inmates listed in paragraph 50 above were placed in the cells in maximum security without any clothes, bedding, or toilet articles, including soap, towels and tissue paper.

57. The maximum security cells measured six feet by nine feet, eleven inches. The following were their physical characteristics on May 23, 1966. Each cell contained a concrete single piece commode with a water pipe extending from the wall and located about two and one-half feet above its top. The water pipe and commode were operated by two pedals located on the floor at the base of the commode. Each cell contained a steel bed attached to the wall with steel slats serving in place of springs. A smaller rectangular drain was located in one corner of the floor at the rear of each cell. In no cell were there any windows or artificial lights.

58. When the plaintiffs were placed in the cells on May 23, 1966, there were no mattresses, sheets, blankets, towels, soap or toilet paper there.

59. Because maximum security draws on a separate stock of supplies, it is routine and accepted practice to place inmates in maximum security cells without clothing, bedding, or toilet articles. These items are issued to all inmates placed there from the general prison

population or from other prisons on transfer as soon as possible.

60. Approximately one hour after the plaintiffs were placed in their cells they were issued two blankets each by the guards.

61. There is no evidence that prison officials feared that the plaintiffs would commit suicide or intentionally damage clothing, bedding or toilet articles issued to them.

62. Contrary to applicable prison regulations and to any reasonable practice, the prisoners placed in maximum security on the morning of May 23, 1966, did not receive clothing, bedding, or toilet articles until the afternoon of May 25, 1966.

63. Because of the age of the facilities, the mechanisms which ran the water pipe and the toilet often did not work. This meant that the toilet or water pipe often could not be turned on or off.

64. When the water was turned on, it often splashed on the floor because there was no way to cover the toilet. The cells became damp and chilly despite the prison officials' practice of keeping the heat slightly above normal.

65. The prisoners had to use the blankets issued to them to wipe up the water and cover the commode so that one inmate in each of cells 1 through 5 could sleep on the floor. Each prisoner was thus left with one blanket to use as bedding and cover.

66. The Graterford incident of May 23, 1966, was one of the most serious in the last fifteen years and could have become a general riot if not quickly contained. It was one of the few incidents which prompted prison officials to send a riot alert to state police.

Following the incident, prison officials and the Pennsylvania State Police conducted an investigation and lodged criminal charges against Knuckles, Green, Tillery and McKee for riot, assault, and conspiracy.

67. On May 25, 1966, the prisoners appeared for a hearing before Deputy Superintendent Wolfe at the Graterford Behavior Clinic.

68. As a result of the hearing, the prisoners were remanded to maximum security to await trial.

69. On May 26, 1966, the prisoners were arraigned in Montgomery County Court and were then returned to maximum security at Graterford.

70. At the time of the Graterford incident, the defendant prison officials knew that the plaintiffs referred to themselves and were referred to by others as Muslims or Black Muslims.

71. Responsible prison officials, including the prison doctor, visited maximum security between the time plaintiffs were placed in their cells there and the time they were first issued clothing and bedding.

72. When inmates are charged with assault, it is the routine and accepted practice in Pennsylvania prisons to keep them segregated until their trials are completed.

73. At Graterford, the same facility is used for administrative and punitive segregation. The only difference between the two is that the prisoner in administrative segregation gets more privileges, such as visitation rights and pencil and paper.

74. At Philadelphia there are separate cell blocks for administrative and punitive segregation.

75. During their first three days in segregation, plaintiffs were not permitted to exercise outside of their cells and were on "reduced diets."

76. With a "reduced diet" the inmate gets slightly less food than is normally given to inmates in the general prison population and no dessert.

77. At Graterford and Philadelphia, prisoners in maximum security who wish to participate in outside exercise must undergo a "strip search" before leaving and again before re-entering their cells.

78. It is a general and accepted prison practice to require maximum security prisoners to undergo a "strip search" each time they go out and return from exercise.

79. While in maximum security and prior to the time they began to accumulate misconducts, plaintiffs were not denied the opportunity to exercise. They were allowed to exercise for one hour per day.

80. Tillery refused to exercise because he felt that the "strip search" was too degrading and did not wish to undergo it.

81. Knuckles and McKee also refused the opportunity to exercise, although their reasons do not appear.

82. The periods and places of confinement of the plaintiffs from and after May 23, 1966, until August 11, 1967, was as follows:

| | Knuckles | Green | Tillery | McKee |
|---|---|---|---|---|
| Total days in segregation | 455 days | 410 days | 420 days | 410 days |
| Total days in punitive or maximum security segregation | 222 days | 222 days | 337 days | 337 days |
| Total days separate administrative segregation unit | 223 days | 188 days | 73 days | 73 days |
| Longest consecutive periods in punitive or maximum security | 189 and 31 days | 189 and 31 days | 189 and 31 days | 189 and 31 days |
| Number of days in general population | 0 days | 35 days | 25 days | 35 days |

83. During this 445 day period reviews of the cases or misconduct reports concerning Knuckles, Green, Tillery and McKee were held on the following dates:

(a) On May 25, 1966, at Graterford;

(b) On or about June 24, 1966, at Philadelphia; and

(c) In November, 1967, at Philadelphia.

84. It is the general practice and policy at Graterford to review the cases of prisoners held in maximum security at least once every thirty (30) days.

85. From May 23, 1966, until June 7, 1966, of the three daily meals served in the prison, a total of forty-eight (48) meals, twenty-three (23) actually contained pork or pork products; thirteen (13) meals contained fried foods, possibly cooked in lard; one (1) meal contained a meat product which might have contained pork but which is not clearly identified; and twelve (12) meals contained no pork or pork products.

86. A prisoner in the general population is permitted to substitute an extra helping of some foods on the menu for those he does not want.

87. A prisoner in a segregated cell is given his platter already filled with the full meal, and he may not add anything to it. Of course, he need not eat anything he does not want.

88. From May 23, 1966, to June 7, 1966, the segregated prisoners at Graterford received their meals on paper plates. About half of the meals were served on plates with dividers, and half were served on plates without dividers.

89. The plaintiffs requested of the guards that no pork or pork products be put on their plates. This information was relayed to Deputy Superintendent Wolfe.

90. From June 8th to June 21st pork or pork products were present in more than half of the meals thrown out.

(a) Knuckles threw his food out of his cell twenty-six (26) times. Of these twenty-six (26) meals, pork or pork products were served at fifteen (15) meals; fried foods possibly cooked in lard were served at nine (9) meals; and meat products possibly containing pork were served at three (3) meals. At three (3) meals he threw his food out when no pork or pork products were arguably present, and he did not throw any food out at three (3) meals, which included pork or pork products.

(b) Green threw his food out of his cell at nineteen (19) meals. Of these (19) meals, pork or pork products were served at twelve (12) meals; fried foods, possibly cooked in lard were served at four (4) meals; and meat products possibly containing pork were served at two (2) meals. At two (2) meals he threw his food out when no pork or pork products were arguably present, and he did not throw any food out at seven (7) meals which included pork or pork products.

(c) McKee threw his food out of his cell at twenty-two (22) meals. Of these twenty-two (22) meals, pork or pork products were served at thirteen (13) meals; fried foods, possibly cooked in lard were served at five (5) meals; and meat products possibly containing pork were served at three (3) meals. At two (2) meals, he threw his food out, although no pork or pork products were arguably served; and he did not throw his food out at five (5) meals which included pork or pork products.

(d) Tillery threw his food out of his cell at twenty-seven (27) meals. Of these twenty-seven (27) meals, pork or pork products were served at fourteen (14) meals; fried foods, possibly cooked in lard, were served at four (4) meals; and meat products possibly containing pork were served at three (3) meals. At six (6) meals, he threw his food out although no pork or pork products were arguably served; and he did not throw his food out at five (5) meals which included pork or pork products.

91. For reasons of punishment and security it is the practice at Graterford to deny exercise to inmates in maximum security who are guilty of misconduct.

92. After each food throwing incident, a misconduct report was entered against the offender, and he was denied the opportunity to exercise.

93. Because of the large number of misconduct reports against plaintiffs, Deputy Superintendent Wolfe concluded that there was nothing to be gained by a review of their cases at the Behavior Clinic and no review was held.

94. A few days after their arrival at Philadelphia on June 21, 1966, Knuckles, Green, McKee, and Tillery were told they would be put in maximum security for thirty (30) days to see how they behaved.

95. From June 21, 1966 to November 28, 1966, while in maximum security at Philadelphia, the plaintiffs were cooperative, and had no misconducts reported against them.

96. Following their transfer back to Graterford on January 3, 1967, the plaintiffs were cooperative and had no misconducts reported against them.

97. Following their conviction on criminal charges growing out of the Graterford incident of May 23, 1966, Knuckles and Green were returned to administrative segregation at Philadelphia.

98. Following their acquittal on criminal charges growing out of the Graterford incident of May 23, 1966, Tillery and McKee were returned to maximum security at Graterford.

99. It is normal and accepted for a prison administrator to determine whether an inmate should be segregated or released into the general prison population on the basis of how dangerous he judges the inmate to be and not on the outcome of a criminal trial.

100. During the time they were at Graterford, plaintiffs were never informed whether their status was administrative or punitive segregation.

101. During the time they were at Philadelphia, plaintiffs were not informed why they were held in punitive rather than administrative segregation after the initial thirty (30) days.

102. On their transfer to Philadelphia, plaintiffs were met by heavily armed guards.

103. The plaintiffs were not permitted to receive any visitors during the entire time that they were in maximum security or punitive segregation.

104. From the time of their incarceration in maximum security at Philadelphia—on or about June 24, 1966, the plaintiffs were never told precisely how long they would be kept in maximum security.

## III.

## DISCUSSION

The conflict here is between plaintiffs' desire to practice their religion while in the custody of the Pennsylvania State Correctional System and defendants' refusal to allow many aspects of that practice. Plaintiffs claim that they were discriminated against in that they were denied the privileges or "equal protection" accorded to inmates practicing other religions. Plaintiffs further claim that because of their religious beliefs, they were punished more severely for alleged infractions of prison rules than were other inmates of other faiths. Finally, plaintiffs claim that certain punishments to which they were subjected were of such a nature and severity as to violate the Eighth Amendment's prohibi-

tion against "cruel and unusual punishment."

### A. Constitutional Standards for the Practice of Religion In Prison.

At the outset it must be emphasized that plaintiffs are prisoners. As such they have less than the full panoply of freedoms and rights which they would have if they were private persons who wanted to exercise religious rights in a non-prison situation. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U. S. 226, 286, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).[1] If plaintiffs were petitioning me as free and private citizens, alleging that public authorities were denying them the right to worship in their own mosque or denying them the right to distribute religious literature to other citizens on the public streets and highways—without hesitation I would assure them the right to have their own place of worship and would assure them the right to exercise free speech without prior censorship or unreasonable prohibition by civil authorities. But a prison is not a private dwelling and a cell row is not a public highway. Thus plaintiffs' freedoms and rights must be analyzed in the realistic context of the prison situation where plaintiffs desire to exercise them.

The nineteenth century penology taught that incarceration "requires deprivation of all rights."[2] In recent times there has been a swing to the "new penology" which has as its premise that "men are sent to prison as punishment rather than for punishment."[3] The new penology puts stress on "education, recreation, better food, better housing,

1. "It is true that prison administration ordinarily demands that rights to speech and assembly, guaranteed to members of a free society by the first and fourteenth amendments, be sharply curtailed. The practice of religion may entail speech and assembly, and thus might be within the realm of prison discipline also. However, incarceration does not necessarily entail the total withdrawal of constitutional rights." 75 Harv.L.Rev., 837, 839 (1962).

2. 20 Rutgers Law Rev. 528.

3. Wallack, Kendall and Briggs, Education Within Prison Walls 1 (1939).

medical care, and 'responsibility for the religious needs of the inmates'."[4]

Within the arc of the penology pendulum Courts must articulate constitutional guidelines which define a prisoner's religious rights in prison as they interact with the rights and duties of prison administrators.

■ There are strong pressures on courts to follow a hands-off approach to the review of decisions by prison administrators. "It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere." Sewell v. Pegelow, 291 F.2d 196, 197 (Fourth Circuit, 1961).

This pressure for non-interference arises from the particular nature and circumstances of the maximum security prison community. The problems of feeding, clothing, housing and providing productive programs in close quarters for some fifteen hundred men who have shown sufficient anti-social behavior to be sentenced to prison are immense. The authority and responsibility to deal with such problems is not lightly given, nor can there be any question that prison administrators must be granted wide discretion in the exercise of their authority. "The power of promulgating regulations necessary for the safety of the prison population and the public as well as for the maintenance and proper functioning of the institution is vested in correctional officials with expertise in the field and not in the courts. There can be no question that they must be granted wide discretion in the exercise of such authority." Long v. Parker, 390 F.2d 816, 820 (3rd Cir.1968).

■ On the other hand, plaintiffs' claims in the instant cases do not involve mere matters of convenience or preference, but rather basic questions of constitutionally protected religious rights. "[I]t is well established that prisoners do not lose all their constitutional rights and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and protect them there from unconstitutional action on the part of prison authorities carried out under color of State law." Washington v. Lee, 263 F. Supp. 327, 331 (M.D.Ala., aff'd. per curiam, sub nom Lee v. Washington, 389 U.S. 967, 88 S.Ct. 457, 19 L.Ed.2d 457 (1967).[5]

Thus in striking a balance between broad discretionary powers sought by prison administrators and "rights" to practice the Muslim religion in prison claimed by plaintiffs, a court cannot be unmindful of strong competing consider-

---

4. For discussion of the new penology, see Wallack, Kendall and Briggs, Education Within Prison Walls 1 (1939); Barnes and Teeters, New Horizons In Criminology, 644–83 (9th Ed. 1950). "Although it may trace its heritage to Bentham, the advent of the "New Penology" may be arbitrarily set in the year 1939 with the publication of the Attorney General's Survey of Release Procedures, which recognized that from the turn of the century until the date of its publication conditions in the majority of the prisons had been substantially the same as in 1800. 5 U. S. Att'y. Gen., Survey of Release Procedures 29 (1939). The New Penology reached its culmination with the adoption by the American Law Institute of the Model Penal Code, in 1962. Within the Code, principles of prison discipline may be found in §§ 301–06." (62 Columbia L.Rev. 1488, footnote 3.)

5. See also Coffin v. Reichard, 143 F.2d 443, 445, 155 A.L.R. 143 (6th Cir.) cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945): "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Compare the statement of the Court of Appeals for the Second Circuit that, "we should point out that the practice of *any* religion, however orthodox its beliefs and however accepted its practices, is subject to strict supervision and extensive limitations in a prison. The principal problem of prison administration is the maintenance of discipline." Sostre v. McGinnes, 334 F.2d 906, 908 (2nd Cir.) cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964).

ations. Fortunately, the Court of Appeals for the Third Circuit has explicitly stated standards to aid in striking this balance.

Defendants admit that the Muslims are a religion and that they are not permitted the practice of their religion to the same extent as are members of other religions. According to the Court of Appeals for the Third Circuit where "the charge is made that the regulations imposed by prison authorities restricting religious practices fall more harshly on adherents of one faith than another, the courts will scrutinize the *reasonableness* of such regulations." Long v. Parker, 390 F.2d 816, 820. (Emphasis added.)

Similarly, as to literature which plaintiffs desire to receive, the Court of Appeals for the Third Circuit directs me to ascertain whether the prison authorities have, "prove[n] that the literature creates a *clear and present danger* of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution." Long v. Parker, 390 F.2d 816, 822.

### B. The Theory And Practice Of The Black Muslim Religion.

The plaintiffs are followers of the Honorable Elijah Muhammad. In most reported litigation, the followers of the Honorable Elijah Muhammad are called "Muslims" or "Black Muslims" and I will refer to them as such in this Opinion.[6]

The followers of the Honorable Elijah Muhammad are a sect of the Islamic religion, and for the purposes of the issues before the Court, they are recognized as members of a bona fide religion. In their brief, defendants state:

"For the purposes of these actions, it is admitted that Black Muslimism is a religion as that term is used in the United States Constitution."[7]

There have been extensive debates about the doctrinal and religious premises of the followers of the Honorable Elijah Muhammad.

The following composite picture of Muslim doctrines and religious premises emerges from the writings of several commentators as compiled in a law review case note:

"* * * Their beliefs have been called 'a peculiar mixture of orthodox Mohammedanism and the personal prejudices of [their leader] Elijah Muhammed.' They compel adherence to a holy book that purports to be the Koran, daily prayer, dietary laws, and abstinence from drinking and smoking; personal morality and family responsibility are stressed. The Black Muslims may eventually be accepted as an Islamic sect, although official Islamic groups in America have emphatically refused to recognize them. But the group cannot be classified as purely religious in nature: 'Although the Black Muslims call their Movement a religion, religious values are of secondary importance. They are not part of the Movement's basic appeal except to the extent that they foster and strengthen the sense of group solidarity.' The central doctrine of the movement is black supremacy and the equation of the white race with 'total evil.' The Black Muslims' exact political aspirations are nebulous, although vague statements have been made concerning the establishment of a separate Black Muslim state in America, estimated to include from one to ten of the present states. How this territory is proposed to be acquired is a matter of mystery. There is within the movement an elite army,

---

6. For general discussions of this faith see Lincoln, The Black Muslims In America (1962); Yaker, The Black Muslims In the Correctional Institutions, 13, The Welfare Reporter 158 (1962); Sostre v. McGinnes, 334 F.2d 906, 908–909, (2d Cir.) cert. den'd. 379 U.S. 892, 85

S.Ct. 168, 13 L.Ed.2d 96; Cooke v. Tramburg, 43 N.J. 514, 205 A.2d 889, 12 A.L.R.3d 1269, 75 Harv.L.Rev. 837, 838–9; 62 Col.L.Rev. 1488; 32 George Washington L.Rev., 1124; 20 Rutgers L.Rev. 528.

7. Defendant's Brief, p. 3.

called the Fruit of Islam, whose activities have been shrouded in secrecy. Despite the admixture of possible revoluntionary elements in Black Muslim doctrine, there is no concrete indication at the present time that the movement is simply designed to mask the activities of a subversive group. Therefore, since substantial emphasis is placed upon religious observances, rigid classification of the movement as nonreligious would appear improper." 75 Harvard L.Rev. 838, 839 (1962).[8]

In Banks v. Havener, 234 F.Supp. 27, 29 (1964) (E.D. Va.), the District Court had a factual record substantially similar to the instant case. There it was noted that:

"Considerable evidence was adduced explaining the dogma of the Muslims and its purported effect upon its adherents, none of which here need be recited. *Suffice it to say, the Black Muslim movement as here taught and followed is a religion.* It has been so held in Fulwood v. Clemmer, D.C., 206 F.Supp. 370; Sewell v. Pegelow, 4 Cir., 304 F.2d 670; Brown v. McGinnis, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791." (Emphasis added.)

The Holy Qur'an is the central book of the Muslim religion and contains its basic teachings and principles. The followers of the Honorable Elijah Muhammad prefer the edition of the Holy Qur'an which contains both the Arabic and English language versions of the text. Prior to October 18, 1969, Black Muslims in prison were not permitted to receive the Arabic-English language edition. The Attorney General of Pennsylvania has since rescinded a state prohibition, and Pennsylvania now permits Muslim inmates to purchase the Arabic-English language edition of the Holy Qur'an.

By defendant's very concession it is evident that the doctrines and teachings of the Holy Qur'an do not constitute any grave problems for prison administrators. Nor is there any claim by defendant that the Holy Qur'an—whether in Arabic or English or Arabic and English —is so inflammatory as to be harmful to prison security.

The more difficult problem before me concerns the writings of the Honorable Elijah Muhammad, in which he in part allegedly interprets the Holy Qur'an and presents his personal view of the Islamic faith. The nub of the controversy here relates to two books—Message to the Blackman in America and The Supreme Wisdom—and a periodical, Muhammad Speaks. Each of these three publications is readily susceptible to a broad range of contradictory and varied interpretations:

(a) From one perspective a rational person could interpret the writings and teachings of the Honorable Elijah Muhammad as an endorsement of a concept of intense hatred for all whites, who are referred to as "devils". Further, these writings and teachings could be interpreted as an endorsement of a concept that whites generally and prison and government authorities should be defied by Muslim prisoners even when legal orders or demands are made.

(b) From another perspective, a rational person could interpret the writings and teachings of the Honorable Elijah Muhammad as merely a partisan historical analysis of this nation's shameful history of slavery and a condemnation of racial discrimination, past

8. In Fulwood v. Clemmer, 206 F.Supp. 370 (1962), Father Charles M. Whalen, testifying as an expert, said:
"I don't know any other religion that teaches racial hatred as an essential part of the faith of the religion. There are many religions which have practiced racial hatred at various times, but this movement is the only movement that I know of which makes it a tenet of the faith that all white people should be hated."

and present, in the United States and other Anglo-Saxon nations.[9]

The latter view sees Black Muslim teachings as merely harsh protests against past racial injustice, urging that such injustices be eradicated by non-violent means. One of the ways to eradicate injustices, according to the followers of the Honorable Elijah Muhammad, is to recognize the futility of ever getting whites to accept the black man on the basis of full equality. Therefore, Black Muslims must learn the necessity of supporting black separatism.[10]

Either of the suggested inferences, (a) or (b), supra, is permissible and undoubtedly many persons in and out of the prison population would adopt inference (a), just as many would adopt inference (b) as a fair interpretation of these writings and teachings of the Honorable Elijah Muhammad.

An example of the conflicting inferences which can be drawn from the writings and teachings of the Honorable Elijah Muhammad is seen in the testimony of Minister Jeremiah Shabazz, an experienced Black Muslim Minister. Minister Shabazz testified that the followers of the Honorable Elijah Muhammad are required by their religion to refrain from acts of aggression against others, to refrain from the consumption of alcohol or the use of drugs, and to be

9. The analysis that America has been guilty of patent racial discrimination in the past is not a new one. Only last year the report of the National Advisory Commission on Civil Disorders noted: "Segregation and poverty have created in the racial ghetto a destructive environment totally unknown to most white Americans. What white Americans have never fully understood, but what the Negro can never forget is that white society is deeply implicated in the ghetto. White institutions created it, white institutions maintain it, and white society condones it. It is time now to turn with all the purposes at our command to the major unfinished business of this nation. It is time to adopt strategies for action that will produce quick and visible progress. It is time to make good the promises of American democracy to all citizens— urban and rural, white and black, Spanish surname, American Indians and every minority group." (Pp. 1–2).

10. Each week in Muhammad Speaks, there is a statement, "What the Muslims Want": "We want our people in America whose parents or grandparents were decedents from slaves, to be allowed to establish a separate state or territory of their own either on this continent or elsewhere. We believe that our former slave masters are obligated to provide such land and the area must be fertile and minerally rich. We believe that our former slave masters are obligated to maintain us, supply our needs in this separate territory for the next 20 to 25 years—until we are able to produce and supply our own needs. Since we cannot get along with them in peace and equality, after giving them 400 years of our sweat and blood and receiving in return some of the worst treatment human beings have ever experienced, we believe our contributions to this land and the suffering forced upon us by white America, justifies our demand for complete separation in a state or territory of our own * * *. We believe that intermarriage or race mixing should be prohibited. We want the religion of Islam taught without hinderance or suppression.

"WE BELIEVE in justice for all, whether in God or not; we believe as others, that we are due equal justice as human beings. We believe in equality—as a nation—of equals. We do not believe that we are equal with our slave masters in the status of 'freed slaves.'

"We recognize and respect American citizens as independent peoples and we respect their laws which govern this nation.

"WE BELIEVE that the offer of integration is hypocritical and is made by those who are trying to deceive the black peoples into believing that their 400-year-old open enemies of freedom, justice and equality are, all of a sudden, their 'friends'. Furthermore, we believe that such deception is intended to prevent black people from realizing that the time in history has arrived for a separation from the whites of this nation.

"If the white people are truthful about their professed friendship toward the so-called Negro, they can prove it by dividing up America with their slaves.

"We do not believe that America will ever be able to furnish enough jobs for her own millions of unemployed, in addition to jobs for the 20,000,000 black people as well."

*obedient to those in lawful authority.* Muslims are urged to be industrious, just, truthful, and prayerful and to obey the dietary rules.[11]

In contrast, non-Muslims testified that the doctrines of the Honorable Elijah Muhammad were "consistently inflamatory" and that at a meeting of the American Correctional Association, the Wardens and Correctional Administrators passed a unanimous resolution that "the Black Muslim movement and followers of Elijah Muhammad in a penal correctional setting was very definitely dangerous to the orderly operation of institutions." (N.T., 910, 911).

At all times relevant hereto, the defendant prison officials in the prisons under their control and direction did *not* permit the Black Muslims to

(a) congregate for prayer meetings or services;

(b) have the assistance and counselling of a Muslim minister;

(c) subscribe to Muslim periodicals;

(d) receive certain Muslim books;

(e) correspond with Muslim ministers or with the Honorable Elijah Muhammad;

(f) receive and wear Muslim medals; or

(g) have special dietary programs consistent with their religious beliefs.

In contrast to limitations imposed on Black Muslims, inmates of the Protestant, Jewish and Catholic faiths regularly had the opportunity to attend religious services conducted by Ministers, Rabbis and Priests of their respective religions. The Roman-Catholic Chaplain at Graterford holds mass every Sunday and on Holy Days, and is permitted to pass freely through the prison and to visit the maximum security cell block.

Defendants mount a two-pronged defense to justify the "reasonableness" of more restrictive prison regulations applied to Black Muslims.

(1) They allege that the basic doctrines of the Honorable Elijah Muhammad are inflammatory and would be harmful if injected into the prison community either by writings or by ministerial visits, and

(2) Beyond the theoretical concepts, they claim, on the basis of actual past experience,[12] that "inmates professing to

11. Minister Shabazz testified:

"A. We are forbidden to eat pork; we are forbidden to eat any pork products, anything that is derived from pork, such as lard and these other by-products. We are forbidden to drink intoxicating beverages, we are forbidden to use dope of any form, any form of narcotics is forbidden. It is forbidden for Muslims to steal, to lie, to be the aggressor. We are taught never to be the aggressor. We are forbidden to commit fornication and adultry.

"Q. Is violence in the doctrine essential to your religion?

"A. No, sir, the name Islam means peace. Therefore peace is the essential theme of our faith. We believe in keeping the peace. We are taught to go to great lengths to keep the peace, to avoid trouble of any kind.

"Q. Would violence be permissible?

"A. Yes. Violence is permissible in our faith only in cases of self defense, and there is certain violence that has to be committed just for the sake of eating. We slaughter ani-

mals and things of that sort to eat, but violence, overt acts against other people are completely forbidden by our faith unless we are attacked first." (N.T., pp. 217, 218.)

12. In addition to the Graterford incident of May 23, 1966, defendants advised the court of several other serious breaches of prison discipline involving Muslims.

1. In June, 1956, a group of prisoners in the prison yard refused to obey a guard's order to disperse, claiming that they had a right to, and intended to, hold a religious service there. One of the prisoners became violent and threatening and had to be taken off to maximum security, at which time the others insisted that they, too, be similarly punished. They were not punished and nothing further occurred. (N.T., 616).

2. In 1959, when Muslim prisoners were permitted to hold services in the outer office of the prison chaplain, a Muslim assaulted an officer in the kitchen. When other officers attempted to take the offender to maximum security the other Muslims interfered, permitting

be Black Muslims create a kind of disruption in a correctional institution," that "Black Muslims as a group are overtly hostile, aggressive and highly emotional;" that "Black Muslim inmates average more misconduct reports than others and are difficult prisoners," and that "Black Muslims congregating as a group are dangerous to the safety and security of a penal institution." Thus, the defendants assert that both the doctrines and the practices of the Black Muslim religion demonstrate the "reasonableness" of the questioned prison regulations.

The admission that prison authorities deny to Black Muslims some of the privileges which are granted to Protestant, Jewish and Roman-Catholic inmates raises the following questions: Can these more restrictive policies as to Black Muslims be justified under the constitutional standard that courts must "scrutinize the *reasonableness* of such regulations?" And, as to religious literature, "* * * [have] the prison officials * * * prove[n] that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution[?]" Long v. Parker, 390 F. 2d 816, 820, 822.

### C. *Black Muslim Cases In The Courts*

The plethora of cases delineating the religious rights of Black Muslim prisoners do not fit neatly into any consistent theoretical or systematic framework. There is substantial danger that many of the leading cases will be read as broader holdings than the facts of the cases permit. In some instances, the holdings of various courts conflict even where factual records are significantly similar. But to the extent that comparative analysis is helpful, I am obligated to note those matters on which there is consistency and those on which there is not.

### 1. *Cases Without Evidentiary Records*

Many of the leading appellate cases discussing Black Muslim prison issues did *not* involve evidentiary records before the court. Despite the broad announcement of general principles, most of these cases stand only for the proposition that the complaint stated a cause of action sufficient to require an evidentiary hearing.

The expansive statements in these non-evidentiary cases seldom answer the precise evidentiary questions which confront trial courts when factual issues

---

the one who committed the assault to escape from the kitchen to a catwalk above one of the cell blocks. Later the other Muslims brought him down and turned him over to the authorities. Because of the general level of unrest that this created, all of the Muslims were placed in segregation. (N.T., 620).

(3) In 1959 or 1960, while 1500 inmates were in the prison recreation yard, a group of Black Muslims formed a circle and began to hold some kind of service. They were "rounded up and removed from the yard" for their own protection. (N.T., 844).

(4) At the State Correctional Institution at Dallas, Pa., in May, 1962, a fight broke out between two inmates. Shortly after the guards started to break it up six other inmates interfered. They later asserted that they were Black Muslims and did not like the way their "brother" was treated by the guards. (N.T., 896).

(5) In June, 1963, at Dallas, Pa., there was an outbreak at breakfast involving nine persons. Six guards were injured. The outbreak was precipitated the evening before when an argument broke out in one of the recreation rooms necessitating the use of force to remove the participants to their cells. At that time, four prisoners attempted to interfere with the guards stating that they would take their "brothers" back to their cells. These four were also ordered out of the recreation area. They, and the individuals to whose assistance they were were Black Muslims. (N.T., 896–898).

None of the present plaintiffs were involved in any of these incidents. But defendants claim there is a relationship between the incidents and Muslim teachings and seek to justify the prohibition of Muslim activities as an effort to prevent the recurrence of such troubles.

have been extensively litigated in full hearings. For example, most of the key appellate cases do not provide guidelines for the situation where there is an evidentiary record which suggests that some Black Muslim prisoners are more inclined to defy prison authority than prisoners of some other religious faith.

The leading Black Muslim prison case before the United States Supreme Court, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030, was a per curiam opinion. The United States District Court had, without a hearing, granted respondent's motion to dismiss on ground that plaintiffs failed to state a claim for which relief could be granted. In reversing the Supreme Court noted:

"Taking as true the allegations of the complaint ['that solely because of his religious beliefs (prisoner) was denied permission to purchase certain religious publications and denied other privileges enjoyed by other prisoners'] the complaint stated a cause of action and it was error to dismiss it. See Pierce v. LaVallee, 293 F.2d 233 (C. A.2d Cir.); Sewell v. Pegelow, 291 F. 2d 196 (C.A. 4th Cir.)."

Of the two cases cited by the Supreme Court as authority, Pierce v. LaVallee, *supra*, was decided on the basis of a trial limited merely to the question of the denial of the Qur'an. The lower court had ruled that "any other problems raised by the complaint concerned matters of prison discipline to be reviewed only in the state courts" and thus it had not held a hearing on these other factual issues. Again, in Sewell v. Pegelow, *supra*, the Court of Appeals for the Fourth Circuit reversed and remanded the matter because the District Court had dismissed the complaints without a hearing.

Similarly, the leading case in our Circuit, Long v. Parker, 390 F.2d 816, was a case where the District Court had dismissed the complaint without a hearing. The Court of Appeals affirmed but the United States Supreme Court in a per curiam opinion reversed the lower courts and held:

"Upon consideration of the suggestion of the Solicitor General and an examination of all of the papers submitted, * * * judgment is vacated and the case is remanded to the Court of Appeals for further proceedings." (384 U.S. 32, 86 S.Ct. 1285, 16 L.Ed.2d 333.)

Upon remand, the Court of Appeals for the Third Circuit held that the pleadings raised fact issues "for the Court's determination only after a hearing." Thus, a hearing was ordered to afford opportunity for the parties to offer evidence as to whether appellants are discriminatingly excluded from the use of the prison chapel and whether the failure to provide a minister or ministers of appellants' persuasion also constitutes discrimination.

### 2. Cases With Evidentiary Records

Various jurisdictions, even when presented with somewhat similar factual evidentiary records, have handed down a series of decisions which are marked by either a patent conflict in the holdings and/or substantial differences in the degree of permissibility granted to Black Muslims to practice their religion in prison.

The State Courts of California have more drastically proscribed the extent to which Black Muslims may actively participate in religious services than have the state courts of New Jersey. And the New Jersey Courts have in turn been more proscriptive of Black Muslim religious activities in prison than the District of Columbia Courts.

The California Supreme Court in In Re Ferguson, (1961), 55 Cal.2d 663, 12 Cal.Rptr. 753, 361 P.2d 417, cert. denied, 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61, was confronted with a situation where "[o]ther religious groups [were] allowed to pursue religious activities, but the Muslims [were] not allowed to engage in their claimed religious practices." The Court held that:

"Even conceding the Muslims to be a religious group it cannot be said un-

der the circumstances here presented that the Director of Corrections has made an unreasonable determination in *refusing to allow petitioners the opportunity to pursue their claimed religious activities* while in prison." (12 Cal.Rptr. 753 at 757, 361 P.2d 417, at 421). (Emphasis added.)

In Cooke v. Tramberg, 43 N.J. 514, 205 A.2d 889, the Board of Managers of the New Jersey State Prison had

"* * * allowed the following liberties which are in the nature of the exercise of religious beliefs. Black Muslims are permitted to receive religious tracts in prison, they may purchase their Qu'ran, and may read it in their cells, they are permitted to gather together in the exercise yard up to six in number, and discuss the Qu'ran, Muslimism and Islam if done orderly and in quiet voice. Moreover, they can have a Black Muslim Minister placed on their visiting list and the Minister may visit each one and give him private counselling without anyone's listening in; and also they have writing privileges to their ministers."

However, the Supreme Court of New Jersey concluded that "the Board determined, in its expert judgment, that the requested *collective worship* would bring about disruption of prison discipline. We cannot say on this record that it is either capricious or arbitrary in so ruling." (Emphasis added.)

In contrast to the New Jersey and California cases, the United States District Court for the District of Columbia and the Court of Appeals of the Seventh Circuit sanctioned broad privileges for Black Muslims to practice their religion in prison. In Fulwood v. Clemmer, 206 F.Supp. 370 (1962), the District Court for the District of Columbia held that allowing some religious groups to hold religious services while denying that right to petitioners and other Muslims constituted a violation of the Order of the Commissioners of the District of Columbia requiring prison officials to make facilities available without regard to race or religion.[13] Though the District Court, in *Fulwood, supra,* relied on its construction of an administrative regulation, later cases pertaining to this same regulation clearly imply that the Court's rationale for permitting full practice of the Black Muslim religion in prison was in part based on federal constitutional grounds.[14]

In Banks v. Havener, 234 F.Supp. 27 (1964), where the Court was construing this same administrative language, there was testimonial evidence that some Muslims had engaged in riots after there had been three weeks of organized Muslim practice at the Youth Center. The Director of the District of Columbia Department of Corrections thereafter prohibited the further practice of the Muslim faith at the Youth Center because in his opinion such practice "constitute[d] a clear and present danger to the security of the institution and its inmates, and because it create[d] tensions which seriously jeopardize[d] the therapeutic program instituted for the rehabilitation of the prisoners." The Director based his

13. On July 18, 1962, the Director of the District of Columbia Department of Corrections, pursuant to a letter of assurances, filed with and incorporated in the Order of the United States Court of Appeals for the Fourth Circuit in Sewell v. Pegelow, 304 F.2d 670, "permitted the free exercise of Muslim rituals and doctrines, including the right to preach their beliefs, at a designated meeting place three times a week with the local Muslim minister presiding (although such meetings were monitored on occasion by various members of the prison staff and written notes of their observations made),

the right to correspond with Elijah Muhammad, the right to wear and display a non-dangerous religious medallion and the purchase by the prison officials of copies of the Koran for the Muslim believers. Banks v. Havener, 234 F. Supp. at 27, 28, 29.

14. In Banks v. Havener, 234 F.Supp. 27 (1964), the court cited First Amendment freedom of religion cases such as Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) as authority for its rulings.

conclusions upon a prior Muslim disturbance and his readings on the subject. The District Judge who reviewed the evidence held "to justify the prohibition of the practice of an established religion at the Youth Center, the prison officials must prove by satisfactory evidence that the teachings and practice of that sect create a clear and present danger to the orderly functioning of the institution. This they have not done."

From my research, it appears that Banks v. Havener, supra, was the first case to apply the clear and present danger test to the prison community. Since Banks v. Havener, there has been a gradual application of the test to prison communities by some courts, including our Circuit. As I construe the holdings of the Court of Appeals for the Third Circuit, in Long v. Parker, 390 F.2d 816, which of course binds me, this Circuit has adopted the clear and present danger test. The test was most explicitly applied to religious literature. However, I must conclude that in holding that

courts "will scrutinize the reasonableness" of certain prison regulations, the Court of Appeals for the Third Circuit incorporated a clear and present danger test within the standard of "reasonableness."

 From the standpoint of prison administration, it is irrelevant whether the danger to prison operations is caused by religious literature or by the practice of religion. I see no way to justify exposing prison operations to greater danger by reason of religious literature than by reason of other forms of religious practice. Thus, I must conclude that in this Circuit the clear and present danger test is applicable to religious literature as well as to other forms of religious practice in prison.

If this matter were *sui generis* and I did not have the benefit of standards articulated by the Third Circuit, with utmost respect I submit that I would probably not hold prison authorities to the heavy burden of proof inherent in the clear and present danger test.[15] For that

15. The "clear and present danger" test was first articulated by Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470. That case, a landmark in spelling out constitutional principles underlying First Amendment rights, arose as a result of prosecutions under the Federal Espionage Acts of 1917 and 1918 for interference with the American World War I effort. The test underwent further development in the context of the right to advocate unpopular ideas in the general community.

Thus, in Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, the Supreme Court held:

"[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, Chaplinsky v. New Hampshire, * * * is nevertheless protected against censorship or punishment,

unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."

Certainly the rationale of the clear and present danger test has extraordinary merit in its application to the general community. But the risks are far greater when, because of the application of the test to the prison community, prison authorities must tolerate speech which, per Terminiello "is often provocative and challenging," or speech which "strike[s] at prejudices and preconceptions and ha[s] profound unsettling effects." The application of the clear and present danger doctrine to the general prison community may very well be subject to grave questions. Indeed, the very application of the test to the prison community may defy practical implementation, since a prison community is by definition composed almost exclusively of permanent residents whose anti-social conduct was considerably more extreme

test was formulated for a general culture and population demonstrably different than a prison culture and population.[16]

If I were free to formulate a new standard to deal with the realities of the clash between fair and effective prison administration and freedom of religion, at most I might have chosen a "clear and *probable* danger" standard. For I fear that the clear and present danger test may require prison authorities to engage in brinkmanship, and I do not believe that they should have to go through a catastrophic riot to create a factual record to justify their finding that there was in fact a clear and *present* danger.

However, I will evaluate the factual issues in this case under the assumption that the clear and present danger test is the guideline.

### D. *The Instant Plaintiffs' Rights To Practice The Black Muslim Religion in Pennsylvania Prisons.*

From the maze of often contradictory decisions arising from factual situations of great similarity I find Cooper v. Pate, 382 F.2d 518 (7th Cir., 1967) to be most persuasive in helping me make the adjudications called for here. In Cooper v. Pate, the lower court, on remand, noted that communications between Black Muslim inmates and ministers "should be allowed within allowable limitations and in conformity with prison practices including usual and general applicable censorship." The Court found that defendant-prison authorities had not shown that such communication "presents a clear and present danger to prison security." The Court of Appeals for the Seventh Circuit did not give firm approbation to the clear and present danger test. The Court however did approve the lower court's holding and stated:

> "[*i*]*f the clear and present danger standard is the correct test,* the district court was clearly correct in finding that communication and visiting had not been shown to pose such danger. Moreover, the denial of the privilege of such communication to adherents of one faith while granting it to others is discrimination on account of religion." (Emphasis added.)

Aided by the Cooper v. Pate decision and by the apparent clear and present danger test rationale of Long v. Parker, I find that plaintiffs are entitled to have Minister Jeremiah Shabazz visit them under reasonable prison regulations for a collective worship service so long as the doctrines that he espouses are identical to those he testified to during court proceedings. (C.f. Findings of Fact 25, supra, p. 1041). So long as Muslim services in prison are of a religious nature and proceed along the lines spelled out by Minister Shabazz, Muslim prisoners will be entitled to have visitations by Muslim ministers and collective

---

than that of persons in the general community.

See: 1 Emerson, Haber, and Dorsen, Political and Civil Rights in the United States, 77 ff; Lockhart, Kamisar, and Choper, Cases and Materials on Constitutional Rights and Liberties, 272–282, 298–304, 381–410, 425–431.

16. See testimony of Dr. Morello on the prison culture, pp. 721, 722:

"A The tension—of course, *the prison community itself is a distinct culture* * * *."

\* \* \* \* \*

"In fact, one of the sayings that is always said in most books that you open up is that the hardest, the worst thing about prison is living with prisoners because it is a restricted community and there is no escape.

"Even in the ghetto, you can get out of a ghetto with its tensions and its problems and its restrictions, but there is *no escape in a prison and this is why* any type of disturbing influence raises this tension level in a confined environment such as a prison."

\* \* \* \* \*

"Q. Would it be safe to describe it as a more volatile situation than the ordinary communal situation?

"A Yes, because of its restrictive nature, because there are few safety valves or few emotional-releasing outlets available to the prisoner."

worship services. *Prison authorities will of course have the right to be present and to monitor these collective worship services in the same manner as they may monitor any other religious services.* If, however, the Muslim gatherings in prison proceed along non-religious lines—if defiance of prison or civil authority becomes the message and substance of such gatherings—the prison authorities may cancel the collective worship and ministerial visitation privileges. The plaintiffs will have the right to ask this Court to review the cancellation of the privileges and the defendants will have the burden of proof to justify the cancellation.

While I recognize that granting defendants the right to terminate meeting and ministerial visitation privileges without prior court approval is contrary to normal equity procedures, the prison problem here presented—the danger to life and prison operations—is not the normal equity situation. Prisons must not be forced to experience a catastrophic riot because they could not have an immediate court review of a situation which in their good faith judgment was patently explosive and could not wait for a court's careful deliberation in an after-the-fact context.

This case is not without great difficulties for me. I personally believe that more than ever before we must exert every effort to create a unified society— and not one that is separatist or racist in structure. I am alarmed by increasing signs of racial polarization. But plaintiffs' religious rights and freedoms are not to be adjudged on the basis of the philosophical or sociological soundness of the concepts they espouse in the name of their religion.[17] My task is not to evaluate plaintiffs' religious wisdom but rather to determine whether regula-

tions of that religion in a prison context are reasonable. Our courts have sanctioned a rather broad panorama of religious freedoms in prisons. These freedoms must be available to religions which support integration as well as to those which oppose it; to religions which are narrowly chauvinistic as well as to those which have broad ecumenical tendencies. Because the door to the practice of religion in prison has been opened, all who would preach religious doctrines must be free to pass through so long as there is no preaching of defiance of prison authority or civil government or other advocacy of acts which create a clear and present danger.

I direct defendants to devise and submit to the court a system for accrediting Muslim ministers to permit them to preach and counsel in Pennsylvania prisons. Some type of listing system might be a workable approach, but I shall give defendants thirty (30) days in which to present a report on the system to be used.

There still remain the troublesome questions of the right to receive certain Black Muslim publications, the right to correspond with Muslim ministers, the right to receive and wear Muslim religious medals, and dietary requests.

■ As to the issue of the plaintiffs' right to receive the requested Black Muslim publications, I find, as did the Court in Cooper v. Pate, *supra*, that plaintiffs have "* * * not sustained [their] burden of showing that the censorship was an abuse of discretion." As noted in Findings of Fact 21(a), supra, (p. 1040), these writings "could be interpreted as an endorsement of a concept that whites generally and prison authorities should be defied by Muslim prisoners even when legal orders or demands are made." According to Minister Sha-

17. From my personal view, no one has expressed more eloquently than Dr. Martin Luther King the type of society which we must try to build. In his "I Have A Dream" speech, Dr. King looked forward to "that day when all of God's children, black men and white men, Jews and Gentiles, Protestants and Catholics, [would] be able to join hands and sing in the words of that old Negro Spiritual, "Free At Last! Free At Last! Thank God Almighty, we are [all] free at last!"

bazz, such a view is not an appropriate interpretation of Black Muslim religious doctrine (see Discussion, pp. 1051 to 1053). Since the literature could be subject to inferences urging such defiance if not properly interpreted by a trained Muslim minister, I rule that it is not mandatory that the prison authorities make available to prisoners the writings. In the hands of the inmate who is not fully informed of the Black Muslim doctrine, as Minister Shabazz purports it to be—under such circumstances the literature could constitute a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution." Long v. Parker, 390 F.2d 816, 820, 822.

It is significant that plaintiffs, like many Muslims in Pennsylvania prisons, became followers of the Honorable Elijah Muhammad after entering prison. Unless a Muslim minister is permitted regular visitation privileges, or a Muslim minister is incarcerated in the same institution, or the followers have been out of prison since becoming Muslims, they will have had no opportunity to learn from a Muslim minister the meaning and proper interpretation of Muslim doctrines.

In this regard the testimony of Frank C. Johnston, an expert witness called by the defense, was persuasive. Johnston, a Superintendent in the Pennsylvania Correctional System for sixteen years, stated:

> "What has happened * * * is that most of the people we know as Muslims in our institution have become Muslims since they were committed to our institutions. Now how they got adequate and proper instruction into the Muslim doctrine I do not know sir, but if they had followed the line as I knew the Holy Koran and the tenets of the Holy Koran I would have absolutely no objection to the Muslim movement * * *" (N.T., 920).

According to Minister Jeremiah Shabazz the proper interpretation of Muslim doctrines requires Muslim prisoners to obey prison administrators and officers and to refrain from acts of aggression against other inmates or guards.

Superintendent Rundle stated his belief that a religious leader would have prevented the developments that grew out of the 1959 kitchen assault described above. The testimony of Dr. Morello, another expert witness called by defendants, pointed up the importance to prisoners of their having someone to bring their troubles to. Interestingly, Dr. Morello, to whom prisoners often brought problems and complaints (N.T., 718–719) remarked: "You are sometimes almost looked on a little bit like a chaplain."

Plaintiffs' need to correspond with Muslim Ministers outside of prison will be greatly alleviated by the regular presence of ministers within prison. As there is a similar prohibitory rule for inmates of all religious persuasions, that regulation is upheld.

I find that plaintiffs have failed to meet their burden of proof to require that inmates be permitted to wear Black Muslim medallions, and the prisoners are not entitled to a special dietary program. Of course they will not be forced to eat pork and pork products.

E. *The Cruel and Unusual Punishment and Equal Protection Issues.*

I turn now to plaintiffs' claim that after the Graterford incident they were subjected to discriminatory punishment and harassment contrary to the treatment accorded non-Muslims and in violation of their Fourteenth Amendment rights. Such treatment, plaintiffs further assert, was so unusual and so severe as to amount to cruel and unusual punishment. The following three circumstances allegedly existed and, plaintiffs maintain, support their requested conclusions of law:

(1) They were segregated, mostly in maximum security without privileges, for an overly long period during which time

(a) they were denied adequate exercise;

(b) they were repeatedly subjected to strip searches; and

(c) their cases were seldom reviewed by prison authorities.

(2) The guards in maximum security at Graterford mixed pork and pork products with other foods on plaintiffs' plates. This was done with the knowledge that plaintiffs' religion forbade their eating pork or pork products.

(3) They were kept two men to a cell six feet by nine feet, eleven inches for two and one-half days without any clothing, bedding (except for two blankets), or sanitary articles. The cells contained only a single bed and were damp and foul smelling because of a malfunctioning toilet.

That the plaintiffs were incarcerated in the maximum security punitive cell block at Graterford for an extended period of time is unfortunately due to the fact that the prison has only a single maximum security cell block which must be used for both punitive and administrative segregation. This is a matter beyond any question of discrimination. All prisoners assigned to segregation at Graterford—for whatever reason—must be housed in the prison's single maximum security cell block.

Certain privileges such as visitation rights and access to pencil and paper are permitted to prisoners in administrative segregation but denied to prisoners in punitive segregation. However, on the record before me, there is no basis for concluding that plaintiffs were denied the privileges of administrative segregation in a discriminatory manner.

At Philadelphia there are separate facilities for punitive and administrative segregation. However, prisoners charged with assault, as was the case here, are routinely kept in punitive segregation until their trials are completed. I find nothing unreasonable about this administrative decision, which is routine and accepted practice in Pennsylvania prisons.

After being interviewed at Philadelphia, plaintiffs were assigned to punitive segregation, where they remained without further review of their cases for about five months. During this time plaintiffs were cooperative and were charged with no misconducts. While as a matter of administrative discretion, some prison authorities would perhaps not have held plaintiffs in punitive segregation for the full five month period, I cannot as a matter of law find this to be an abuse of that discretion. Moreover, there is no evidence to indicate that other prisoners are treated otherwise on transfer from one penal institution to another, and thus no basis for a finding of discriminatory treatment.

Because of repeated misconducts, plaintiffs were given almost no opportunity to exercise during their first 29 days in maximum security at Graterford. In view of the seriousness of the May 23rd incident, the prison authorities acted well within permissible discretion in determining that it was too dangerous to allow the prisoners to exercise outside of their cells. Later, the prisoners were afforded the chance to exercise for one hour every day, but refused because they objected to having to undergo a strip search before and after each exercise period.

The testimony of expert witnesses regarding the ingenious methods devised by prisoners for secreting contraband, including weaponry, on their persons has convinced me that the regulations governing strip searches are neither arbitrary nor lacking in reasonable justification. There has been no showing that plaintiffs were treated any differently than other prisoners with regard to strip searches.

Food was served to maximum security inmates at Graterford on paper plates. As often as not, these plates did not have dividers and had to be bent somewhat to be passed through the opening at the base of the cell door. This might have caused food to run together on occasion. Of course, the prisoners were

never required to eat pork or pork products, and, as there was no evidence that the guards maliciously or purposely mixed pork with the prisoners' food, there can be no finding of discrimination.

The circumstances discussed above have been found not to violate plaintiffs' Fourteenth Amendment due process and/or equal protection rights. The same facts are resubmitted by plaintiffs along with the two and one-half day incident of denuded incarceration to support their allegations of cruel and unusual punishment.

The Major focus in deciding whether plaintiffs' Eighth Amendment rights have been violated must be on the long period of maximum security segregation and the two and one-half days plaintiffs were forced to spend without clothing or bedding in cramped quarters. Such matters as reduced exercise opportunities, strip searches, and the serving of food mixed with pork do not rise to the level of severity associated with cruel and unusual punishment, and what has previously been said about these alleged Fourteenth Amendment violations warrants a similar denial of plaintiffs' Eighth Amendment claims as well.

Knuckles, Green, Tillery and McKee each spent more than 400 days in segregation, including one period of 189 consecutive days in maximum security. That period of time spent in segregation prior to trial does not enter into my consideration of the length of time plaintiffs were in segregation, because I find the policy of segregating inmates pending trial on charges of assaults *which took place in prison* to be well within the discretion of the prison authorities. For all save a small part of that time plaintiffs had the option of exercising for one hour each day. While in segregation plaintiffs were guilty of numerous and continuing misconducts. Penology experts testified that misconducts have a legitimate bearing on how long a prisoner is to be kept in segregation. Prison authorities are responsible for the security and stability of the entire institu-

tion, and when individual prisoners pose a threat to security or stability, when by their conduct prisoners demonstrate that they are not ready or able to adjust to congregated prison life, it seems well within the discretion of prison administrators to keep such prisoners for long periods—some experts were willing to say indefinite periods—of time in segregation. In view of the extremely serious nature of the Graterford incident of May 23, 1966, it was not unreasonable to segregate the prisoners for the periods of time stated.

In Graham v. Willingham, 10 Cir., 384 F.2d 367, a prisoner convicted of second degree murder alleged cruel and unusual punishment because of "prolonged and unreasonable segregated confinement in the maximum security facilities at Leavenworth". The facts of that Tenth Circuit case do not exactly match the cases at bar in that the petitioner there had participated in extreme violence, including murders, while he was at large among the prison population. For his conduct he was segregated continuously for more than two years. While petitioners here are not guilty of as severe misconduct, their periods of segregated confinement are far shorter. I agree with the Graham v. Willingham court which found the policy of segregation to be "perfectly proper and lawful." As the Court said, "its administration requires the highest degree of expertise in the discretionary function of balancing the security of the prison with fairness to the individuals confined." Here, as there, the prisoners' confinement in segregation was "the result of the considered judgment of the prison authorities and was not arbitrary." 384 F.2d 368.

Finally, there is the question of the two and one-half days spent by the plaintiffs, two to a cell—six feet by nine feet, eleven inches. The cells had no windows and no artificial light. Each cell had only a single bed and the cells were damp and foul smelling from water splashing on the floor as a result of malfunctioning toilets. The men were given no clothing or bedding, save two blan-

kets, which had to be used to absorb water from the overflowing toilet and further as a mattress. The men were given no soap, no towels, no toilet tissue, no toilet articles.

The conditions were somewhat less severe but still quite similar to those described by the court in Wright v. McMann, 2 Cir., 387 F.2d 519. There the solitary confinement cell was described as "dirty, filthy and unsanitary, without adequate heat and virtually barren; the toilet and sink were encrusted with slime, dirt and human excremental residue * * * ". The plaintiff was kept completely nude for eleven days and was denied all hygenic implements and utensils.

While petitioners here were faced with a damp cell and not a freezing one, and while there were no physical beatings and the period of confinement in question was two and one-half days and not eleven days, still I fully concur with the view of Judge Kaufman in the Wright v. McMann case and adopt it here:

> "Civilized standards of humane decency simply do not permit a man for a substantial period of time to be denuded * * * and to be deprived of the basic elements of hygiene such as soap and toilet paper. The subhuman conditions * * * could only serve to destroy completely the spirit and undermine the sanity of the prisoner. The Eighth Amendment forbids treatment so foul, so inhuman and so violative of basic concepts of decency."

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the consolidated actions under the Civil Rights Act, 42 U.S.C. § 1983.

2. Plaintiffs are entitled to have Minister Jeremiah Shabazz—and other ministers accredited in accordance with this Opinion—visit them under reasonable prison regulations for a collective worship service so long as the doctrines espoused by the ministers are identical to those Minister Shabazz testified to during the court proceedings.

3. It is not mandatory that defendant-prison authorities make available to prisoners the Muslim periodicals and the Muslim books in question.

4. The prison regulation on correspondence with ministers outside of prison is upheld.

5. Plaintiffs have failed to meet their burden of proof to require that inmates be permitted to receive and wear Muslim medals.

6. Prisoners are not entitled to a special dietary program.

7. Plaintiffs were subjected to cruel and unusual punishment, but since it does not appear that this practice has been or will be continued, injunctive relief is DENIED.

8. Except as noted in Conclusions of Law (2) and (7), plaintiffs were not subjected to discriminatory punishment and harassment contrary to the treatment afforded non-Muslims and in violation of their Fourteenth Amendment rights.

9. No monetary damages are awarded.

## ORDER

AND NOW, this 31st day of July, 1969, it is hereby ORDERED that counsel for the parties explore and stipulate to specific methods for affording relief to the plaintiffs consistent with this Opinion.

Counsel are directed to devise and submit to the Court within thirty (30) days a system for accrediting Muslim ministers to permit them to have collective worship services in Pennsylvania prisons in a manner which is substantially similar to that granted to ministers of other religious faiths.

The parties are FURTHER ORDERED to submit a proposed form of Order consistent with this Opinion.